670 A.2d 1012

**STATE of Maryland**

v.

**Gary Lee JOHNSON.**

**No. 203, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Feb. 1, 1996.

Alan D. Eason, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief) Baltimore, for appellant.

James A. Sullivan (James A. Sullivan, Jr. and Sullivan & Talbott, on the brief) Rockville, for appellee.

Argued before DAVIS and HOLLANDER, JJ., and PAUL E. ALPERT, Judge (retired), Specially Assigned.

HOLLANDER, Judge.

Gary Lee Johnson, appellee, was sentenced to a term of imprisonment as a result of a criminal conviction he received in the Circuit Court for Montgomery County (Judge Paul H. Weinstein, presiding). During his incarceration, Johnson required medical treatment and nursing care related to his condition as a quadriplegic. After Johnson was released from prison, he sued the State, appellant, in the Circuit Court for Montgomery County, alleging negligence in connection with the medical care that he received while he was in prison. The circuit court (Judge D. Warren Donohue, presiding) found the State liable for negligence and awarded Johnson $25,000 in damages. On appeal to this Court, the State presents two issues for our review, which we have rephrased slightly for clarity:

1. Did the Circuit Court err as a matter of law in finding that State personnel had a legal duty to develop a "plan" for Johnson's treatment while he was an inmate in the Maryland State Penitentiary?

2. Even if the State owed a duty to develop such a plan, was the court clearly erroneous in finding the State liable for negligence under the Maryland Tort Claims Act?

We answer the first issue in the affirmative and, therefore, we decline to address the second question. Accordingly, for the reasons discussed below, we shall vacate the decision of the circuit court and remand to that court for further proceedings consistent with this opinion.

## Factual Background

Johnson has been a quadriplegic since 1972, when he suffered spinal cord injuries in a swimming accident. As a result, he has no muscle control or feeling in his body below his neck and shoulders and must use a super pubic cystostomy ("catheter"), which is inserted in his bladder, to discharge urine. Because of his paralysis, appellee requires daily nursing care, which includes skin, bowel, and catheter care, as well as range of motion exercises for his joints.

On December 4, 1986, Johnson was convicted on drug related charges and sentenced to serve two concurrent terms of five years and three years. The Division of Correction ("DOC") placed appellee in the Maryland Penitentiary Hospital. At the relevant time, PHP Healthcare Corporation ("PHP") had a contract with the State to provide all health care services to inmates in the custody of the DOC.[1] All of the medical services hereinafter mentioned were provided by PHP.

On February 17, 1988, after his release from prison, Johnson notified the State Treasurer's Office of his claim against the State, pursuant to the Maryland Tort Claims Act ("MTCA"), Md.Ann.Code, State Gov't art. ("S.G."), §§ 12–101 to 12–501 (1984). Subsequently, on September 26, 1989, Johnson filed a negligence suit alleging, *inter alia*, that while in the State's custody from December 1986 until December 1987, the State "abused" him by fracturing his arm and "failed to properly render necessary care and treatment to maintain the

---

1. The State never offered its contract with PHP into evidence. Although the State's evidence as to the contract was rather scanty, appellee does not contest, on appeal, either the existence of the contract or that Johnson's medical care was provided by PHP.

Plaintiff's physical condition, although it knew or should have known that such treatment was vital to his health." He sought damages for emotional and physical injury caused as a result of the State's negligent and careless treatment of him while he was incarcerated.

At trial, appellee testified generally to DOC's neglect of his medical condition. But, with the exception of one nurse, he did not identify any particular health care provider. Appellee said that, while he was at the Penitentiary, the State failed to provide him with range of motion exercises and proper skin care to prevent blisters and bed sores. Additionally, he said that the nurses failed to clean and change the bandages around his catheter, which leaked, and that they neglected Johnson's painful bowel problem. Also, on one occasion when Johnson's bladder became exposed, he claimed that a doctor in the prison used his finger to push the bladder back into appellee's body, thereby causing appellee's bladder to bleed and become inflamed.

Appellee also explained that, in light of the inadequate nursing care, he asked the circuit court to reconsider his sentence. Thereafter, at a hearing on February 20, 1987, appellee informed the court of his concerns about his medical care, but the court did not then modify his sentence.[2]

Johnson further testified that, for approximately one week after the sentence reduction hearing, the nurses in the prison intentionally failed to provide him with needed nursing care. When nursing care commenced, he claimed that it was still inadequate. At this time, the nurses continued to neglect Johnson's bowel problem and his catheter, which leaked regularly.

Appellee also said that, on April 30, 1987, during a therapy session, Eugene Wooden, a nurse who worked in the prison, fractured Johnson's humerus when he accidentally applied inappropriate force to Johnson's arm, despite appellee's appar-

---

2. The transcript of the February 1987 sentence modification hearing was not offered into evidence.

ent discomfort and pain. Johnson further stated that, after he received a plastic arm cast at the Johns Hopkins University Hospital, the nurses exacerbated his injury and his pain by lifting him under his shoulder and by rolling him on his upper arm to move him to his wheelchair.

On May 26, 1987, Johnson was transferred to the DOC facility in Hagerstown, where he was placed in the medical unit. Johnson testified that the nurses there did not provide needed therapy, mistreated his arm injury, and failed to care properly for his bowels, bladder condition, and catheter.

Johnson also testified that, in December 1987, because of the DOC's persistent neglect of his health, he again petitioned the circuit court to reconsider his sentence. On December 21, 1987, that court held another hearing and considered Johnson's allegations about the prison's inadequate medical care. At the hearing, Richard Delaney, M.D., who was Johnson's treating physician since his accident, testified on Johnson's behalf. The court reduced Johnson's sentence to one year, thereby releasing appellee from the State's custody.[3]

Additionally, appellee stated that, after his release, he suffered from increased health problems. These problems included poor range of motion because of calcium build-up in his joints and a persistent "pulling of a muscle-type" pain in his shoulder, which required medication.

At trial, Johnson's "base file" and prison medical records were introduced into evidence. The medical records primarily consisted of reports of daily medical care, progress notes from doctors and nurses, radiology and lab reports, as well as emergency room records.

In addition, in support of his claim, appellee presented the testimony of Dr. Delaney, who stated that, in order to maintain physical health, a quadriplegic must receive a daily regi-

---

3. Judge Donohue could not locate the order from Judge Weinstein regarding the sentence reduction, and the transcript from the 1987 hearing was not admitted in evidence. Accordingly, Judge Donohue did not know the actual reasons for the sentence reduction.

men of nursing care that includes care of the skin, bowel, and catheter, as well as range of motion exercises. Dr. Delaney testified:

> It is mostly supportive nursing care. Since he can't do anything for himself, including just move about in bed, he requires skin care. He is subject to pressure sores.... So he requires skin care, a certain amount of massage, and use of various creams and things from time to time to keep his skin moist and viable. He requires range of motion to keep his joints subtle [sic].

> He requires bowel care, because he would become constipated easily if his diet and bowels weren't taken care of properly. He has a super pubic cystostomy, which is a tube that is placed directly through the abdomen into the bladder.

> That requires care, because it is subject to infection. He has had several infections despite care.

Moreover, based on Johnson's testimony, Dr. Delaney said that the State did not meet these minimal requirements of care for Johnson when he was incarcerated. He stated:

> I do believe that Mr. Johnson's care was not up to what we would normally consider standard care for a quadriplegic patient.... Because standard care of a quadriplegic patient would encompass, you know, all of the things that we had discussed before, skin care, bowel care, catheter care, joint care.... *[I]t is standard care that you have a program to take care of all of these things, that the program is followed.*

> It is just my impression from what I heard that the program wasn't followed.

(Emphasis added). On cross examination, Dr. Delaney explained that he "wasn't aware there was a program to care for Johnson. That is what I meant to say."

Eugene Wooden, a registered nurse, was the State's only witness. He testified only to the fact that, at the relevant time, he was an employee of PHP, which operated under a contract with the State. Additionally, the State offered a

letter that Dr. Delaney wrote to Johnson's counsel in September 1988, after he reviewed appellee's prison medical records. In the letter, Dr. Delaney concluded:

Reviewing these records en masse indicates that Mr. Johosn [sic] received what I would consider routine medical care, at least according to the documentation that I see in the records. The one question that does come to my mind is the fact that the fracture happened at all. It should be well known that quadriplegics, such as Mr. Johnson, routinely develop osteoporosis and that there is an increased vigilance required to prevent such things as fractures during range of motion exercises.

The State provided no additional evidence of its own about the quality of care that appellee received during his incarceration. Nonetheless, it denied liability, claiming: (1) appellee failed to file a timely claim with the State Treasurer, pursuant to S.G. § 12–106(b); (2) the claim was barred by sovereign immunity because the PHP employees were not "State personnel" for whose actions the State is liable under the MTCA; and (3) appellee failed to meet the condition precedent of filing a Statement of Claim with the Health Claims Arbitration Office ("HCAO"), pursuant to Md.Code Ann., Cts. & Jud.Proc. art. ("C.J."), § 3–2A–02.

In a ruling from the bench, the court found the State liable for negligence under the MTCA. The judge stated:

What I find from the evidence in this case is as follows: I find that the State of Maryland had a duty to come up with a plan for the care, treatment, and confinement of the plaintiff, who at the time he was sentenced was a quadriplegic.

I feel a fair reading of the complaint raises that as part of his claim. And based upon the facts presented, the conclusion that I come to is that the State had a duty to do that, a reasonable plan for the plaintiff.

I further find that as a matter of fact it failed to do that. I base that finding upon the evidence of the plaintiff himself, whose testimony in that regard to a large extent, was if not

entirely, was uncontradicted, and I find his testimony in that regard credible.

I also base that conclusion on a review of the records that were offered into evidence. And I also base that conclusion on the inference that I draw from the action taken by Judge Weinstein in releasing the defendant—sorry, in reducing his sentence at the December 1987 hearing.

I further find that as a result of the State's failure to come up with a plan, that the plaintiff was injured, and that those injuries in part at least were incurred from the period of August 21 until December of 1987 when he was released.

So, in other words, I find that plaintiff has alleged a duty, has proven a duty that the plaintiff alleged to breach, and has proven a breach, and I further find from the evidence that as result of that breach the plaintiff has alleged and proven by a preponderance of the evidence an injury.

The court further concluded that the State could not delegate to PHP its responsibility to create a plan for Johnson's care. The court said:

I find that initially, and I rest my decision on this theory, the State had a duty to come up with a plan, and that the negligence was not in the execution of a plan, but rather, which may have been done by non-State personnel, but rather the failure was in there being no plan at all, and that was the State's duty.

I don't think the State argues that it delegated that duty. But to whatever extent that argument is made, I find that to be a non-delegable duty. And that therefore, the State's argument that the claim should not be allowed because it didn't involve State personnel is denied.

In light of the MTCA's requirement that a claim for injury must be filed within 180 days of the occurrence of the injury, S.G. § 12–106(b)(1), the court only permitted recovery for the time period between August 21, 1987 and appellee's release on December 21, 1987. Further, the court rejected the State's sovereign immunity defense, based on its determination that the State was negligent because of its own failure to prepare a

plan, without regard to the alleged negligence of PHP in providing health care.

Additionally, the court held that it had jurisdiction over Johnson's claim, although the claim had not first been filed with the HCAO, pursuant to C.J. § 3–2A–04. The court predicated this conclusion on its finding that it "is not so much that there was an improper execution of the plan, which would certainly have been in part a medical plan, and involved medical treatment, and therefore raised an issue of . . . whether it should go before the Health Claims Arbitration Board, but rather was the failure to come up with any plan at all."

## Discussion

The parties agree that the State has a duty to provide reasonable medical care and treatment to inmates in its custody.[4] The State argues, however, that it satisfied this obligation by hiring PHP to deliver medical services to prison inmates. But, as we have observed, the circuit court did not impose liability on the basis of the medical care that was furnished. Rather, the circuit court determined that the State's duty to Johnson extended beyond its obligation to *provide* medical services, for which it may have contracted with PHP. Instead, the court held that the State owed appellee a separate duty to create a "plan" for his care and treatment. We agree with the State that the trial court erred in its construction of the scope of the State's duty to Johnson while he was incarcerated. Consequently, we vacate the court's decision and remand this case for further proceedings. We explain.

Based on the MTCA, appellee sued the State for negligence with respect to his care. Johnson alleged, *inter alia,* that the State failed "to properly render necessary care and treatment

---

4. The State has not asserted that Johnson was required to pursue his claim while he was incarcerated, pursuant to inmate grievance procedures set forth in Md.Ann.Code Art. 41, § 4–102.1 (1994). Accordingly, we do not consider the applicability of inmate grievance procedures to the circumstances of this case. We note, however, that Johnson was not an inmate when this case was initiated.

to maintain the plaintiff's physical condition, although it knew or should have known that such treatment was vital to his health." Significantly, appellee did not assert in his complaint that the State breached its duty of care by failing to formulate a treatment plan for him. Moreover, Johnson does not claim that the State was negligent in selecting PHP as a health care provider or by failing to monitor the quality of PHP's care. Nor has Johnson alleged that, by withholding constitutionally required medical services, he was subjected to cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251, (1976);[5] *Sawyer v. Sigler,* 320 F.Supp. 690, 693 (P.1970 Neb.), *aff'd.,* 445 F.2d 818 (1971). Rather, Johnson's suit, based on his specific allegations, constitutes a negligence claim, and we shall analyze it in that light.

To establish his claim against the State, Johnson must show that: (1) the State owed a duty of care to him; (2) the State breached that duty; (3) Johnson sustained injury; and (4) the injury was proximately caused by the State's breach of duty. *See Rosenblatt v. Exxon,* 335 Md. 58, 76, 642 A.2d 180 (1994). We focus initially on the element of "duty." The issue of duty "is an issue of law, to be determined by the court." *Id. See also* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 45, at 320 (5th ed. 1984); *Restatement (Second) of Torts* (1977) § 328B & cmts. e-f. Consequently, the circuit court's "interpretations of law enjoy no presumption of correctness on review [and we] must apply

---

5. In *Estelle,* the Supreme Court recognized that not every assertion by a prisoner of inadequate medical treatment constitutes an Eighth Amendment violation. "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Based on the prisoner's particular claims, however, the Supreme Court concluded that the prisoner set forth a claim of medical malpractice, cognizable under the Texas Tort Claims Act. *Id.,* 429 U.S. at 107, 97 S.Ct. at 292.

the law as [we] understan[d] it to be." *Rohrbaugh v. Estate of Stern*, 305 Md. 443, 446 n. 2, 505 A.2d 113 (1986).

Ordinarily, courts will not impose an affirmative duty to protect the interests of another, absent a special relationship between the parties. *See Prosser* § 56, at 373–75. That special relationship existed here; when the State incarcerates an individual, the inmate is entirely dependent on the State, which has exclusive control over the care and confinement of prison inmates. *See Prosser* § 56, at 376 (the special relationship between a jailer and his prisoner justifies imposing a duty to protect prisoners). Accordingly, we agree with the parties that the State owes a duty to provide reasonable health care to its prisoners. Of particular importance to this case, we conclude that the State may discharge its duty by employing its own qualified health care providers or, alternatively, by contracting with a private health care provider who then provides treatment through its own employees. Here, the State sought to fulfill its duty by hiring PHP and, as we have noted, appellee did not allege that the State was negligent in selecting PHP or in monitoring PHP.[6]

Although we are unaware of any Maryland case that addresses the State's duty to furnish medical care to prison inmates, we find support for our view regarding the State's duty from the case of *Williams v. Wilzack*, 319 Md. 485, 486, 573 A.2d 809 (1990). There, at least in the context of mental illness, the Court of Appeals recognized the State's obligation to provide treatment to patients who are involuntarily committed to mental hospitals. *See also* Md.Code Ann., Health Gen. Art. ("H.G."), § 10–701(c)(1) (1994); *State v. Washington Hosp.*, 223 Md. 554, 557, 165 A.2d 764 (1960) ("[T]here is a duty upon a sanitarium or hospital to exercise such care in looking out for and protecting a patient as the circumstances,

---

**6.** Nor do we consider Johnson's right to have pursued a negligence claim against PHP.

including known mental and physical conditions, may require.").

Moreover, in a variety of other contexts, courts in other jurisdictions have found that prisons owe a duty to use reasonable care to protect the health of prisoners in their custody. *See, e.g., Clemets v. Heston,* 20 Ohio App.3d 132, 20 OBR 166, 485 N.E.2d 287, 292 (1985) (a law enforcement officer possessing custody of an arrestee or prisoner owes a duty of reasonable care for the "health, care and well-being of the prisoner"); *Collins v. Schoonfield,* 344 F.Supp. 257, 277 (D.Md.1972) (in a § 1983 action, a jail is required to afford reasonable medical treatment to inmates which "includ[es] reasonable medical examination, access to sick call, *treatment for special medical problems,*" adequate dental care, and sufficient suicide prevention measures) (emphasis added); *Sawyer v. Sigler,* 320 F.Supp. at 696 ("When a state undertakes to imprison a person, thereby depriving him largely of his ability to seek and find medical treatment, it is incumbent upon the State to furnish at least a minimal amount of medical care for whatever conditions plague the prisoner."). *See also Cockrum v. State,* 843 S.W.2d 433, 436 (Tenn.App.1992) (the duty of prison officials to use reasonable measures to protect the well-being of prisoners in its care may include the duty to prevent "self-inflicted injury or death when the prison officials know" or should know of the prisoners' propensity to injure themselves); *Buffington v. Baltimore County,* 913 F.2d 113, 119 (4th Cir.), *cert. denied,* 499 U.S. 906, 111 S.Ct. 1106, 113 L.Ed.2d 216 (1990) ("The due process clause guarantees a pretrial detainee the right to adequate medical care at least where the State's failure to provide such care would amount to deliberate indifference to a serious medical need.").

Further, in *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251, *reh'g denied,* 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1976), the Supreme Court considered a prisoner's constitutional claim against the State of Texas for inadequate treatment of a back injury sustained in prison. What the Court said as to a State's duty to furnish medical care to its prisoners is instructive here:

> [E]lementary principles establish the government's obligation to provide medical care for those whom it is punish-

ing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.... The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view the 'it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.'

We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' ... proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

*Id.,* 429 U.S. at 103–05, 97 S.Ct. at 290–91 (citations omitted).

Maryland statutory law further supports our view that the State owes a duty to provide health care to its prisoners. Pursuant to Md.Ann.Code, Art. 41, § 4–401 (Supp.1995), the Legislature created the Commission on Correctional Standards (the "Commission"), which is charged with establishing " 'mandatory standards' [or] policies and procedures in areas of security and inmate control, inmate safety, inmate food services, inmate housing and sanitation, inmate rights, classification, hearings, and administrative record keeping." Md. Ann.Code, Art. 41, § 4–401(b)(7), (d)(8). Pursuant to its statutory mandate, the Commission recognizes that:

It is in the best interest of the general public, correctional administrators, and the appropriate governmental authorities that the life, *health,* and safety needs of the incarcerated population are met on a continuing basis. Fire prevention and protection services, *medical,* dental, and mental health care services, and the protection against other life-threatening or health endangering conditions are essential

to the effective administration, sound management, and efficient operation of a correctional facility. . . .

COMAR 12.14.05.02B. In addition, COMAR 12.14.05.02B requires the managing official of a correctional facility to establish a variety of procedures that address, generally, the provision of medical care. For example, COMAR 12.14.05.02B states, in pertinent part, as follows:

(7) Ensure that 24–hour emergency medical services are available including:

(a) Ready access to hospitals, health clinics, and medical centers;

(b) An on-call physician, and

(c) First aid kits approved by qualified health care personnel at appropriate locations with the provision for monthly inventory;

(8) Have a written medical emergency evacuation plan coordinated with and reviewed by appropriate local agencies and organizations, and communicate to appropriate facility personnel;

(9) Ensure that facility personnel certified in basic first aid and cardiopulmonary resuscitation are readily available at all times;

(10) Have a written policy and procedure ensuring that the methods for gaining access to health care services are communicated to all inmates and appropriate facility personnel;

(11) Have a written policy and procedure which provides that medical screening of an inmate is conducted by health-trained or qualified health care personnel for all inmates within 24 hours of admission to an initial reception facility which includes provisions for:

(a) Designation of current health problems, medications taken, special medical needs, use of alcohol and drugs, past treatment or hospitalization, suicide attempts, history of mental disturbances, and notation of skin condition, body deformities, and behavior,

(b) Referral without unreasonable delay to appropriate health care services, and

(c) Staff notification of special medical problems, including availability for work assignment;

(12) Have a written policy and procedure for the dispensing of prescription medication. . . .

(13) Have a written policy and procedure for the administration of prescription and over the counter medication . . .

(16) Ensure that all health care personnel who provide services to inmates adhere to the applicable State licensing, certification, or registration requirements . . .

None of the above authorities, however, supports the trial court's conclusion that the State owed appellee an independent duty to create an individualized treatment plan for his health care, separate and distinct from the State's general duty to furnish reasonable medical treatment. We recognize that, by statute, an individualized treatment or rehabilitation plan must be created for mentally ill patients who are institutionalized. Md.Code Ann., Health Gen. art. §§ 10–701(c), 10–706.[7] There is, however, no comparable statutory provision that applies to inmates in State correctional facilities. While COMAR regulations require the State to adhere to certain

---

7. Section 10–701(c) provides:

Each individual in a facility shall:

(1) Receive appropriate treatment and services in a manner that restricts the individual's liberty within a facility only to the extent necessary and consistent with the individual's treatment needs and applicable legal requirements.

(2) Receive treatment *in accordance with the applicable individualized plan of rehabilitation or the individualized treatment plan provided for in* § 10–706 of this subtitle.

(Emphasis added). Section 10–706 states:

(a) *Plans required*—(1) Except as provided by paragraph (2) promptly after admission of an individual, a facility shall make and periodically update a *written plan of treatment for the individual in the facility,* in accordance with the provisions of this subtitle.

(2) Promptly after admission of an individual to a psychosocial center, the *center shall make and periodically update a written plan of rehabilitation for the individual in the facility,* in accordance with the provisions of this subtitle.

(Emphasis added).

minimum standards for the health and safety of prison inmates, these provisions do not specifically require the State to create an individual treatment plan to address the special needs of an individual prisoner. Rather, the State is only required to create general written policies and procedures that relate to the care of *all* prison inmates.

Moreover, the obligation to create an individualized treatment plan is more appropriate in the context of mental health facilities, given that a patient in that kind of facility is institutionalized due to his or her mental illness. In contrast, prison inmates are incarcerated because of their crimes; any need for medical treatment is ancillary to the reason for which the person is incarcerated.

Furthermore, we find no sound basis to separate the plan for the delivery of medical treatment from the actual provision of health care services. When the State contracts with a medical expert to provide health care for its prisoners, logic suggests that formulation of the appropriate or necessary plan of treatment is part of the expert's function. Professional, trained health care providers are the ones who are equipped with the knowledge to formulate the plan for treatment, based on their medical expertise. Thus, at least in the context of this case, we conclude that the duty to provide medical care necessarily includes the duty to create a plan for the type of care that is needed. The duty to create the plan cannot be parsed out from the duty to provide the care.

Appellee further argues that, in concluding that the State was obligated to create a plan for Johnson, the trial court made a finding of fact that we cannot set aside on review unless it was "clearly erroneous." Even if we accept appellee's argument that the circuit court's finding of a duty to create a plan of treatment was one of fact, to which the "clearly erroneous" standard applies, our result would not change.

■ Under the clearly erroneous standard set forth in Md. Rule 8–131(c) (1995),

our function is not to determine whether we might have reached a different conclusion. Rather, it is to decide only whether there was sufficient evidence to support the trial court's findings. In making this decision, we must assume the truth all the evidence, and of all the favorable inferences fairly deducible therefrom, tending to support the factual conclusions of the lower court.

*Mercedes–Benz v. Garten,* 94 Md.App. 547, 556, 618 A.2d 233 (1993). Therefore, if "competent material evidence" supports the trial court's findings, we must uphold them and cannot set them aside as "clearly erroneous." *Nixon v. State,* 96 Md. App. 485, 625 A.2d 404, *cert. denied,* 332 Md. 454, 632 A.2d 151 (1993).

The trial court based its finding that the State "had a duty to come up with a plan for the care, treatment, and confinement of" Johnson on "a fair reading of [appellee's] complaint [which] raises that as part of his claim" and the testimony presented by appellee at trial. But Johnson did not plead, even inferentially, that the State had an independent duty to create a plan, separate and distinct from the State's obligation to provide adequate medical services. Rather, as we have noted, appellee complained about the quality of the health care that was provided. Johnson alleged that the State "failed *to properly render* necessary care and treatment to maintain the plaintiff's physical condition, although it knew or should have known that such treatment was vital to his health." (Emphasis added).

Moreover, Dr. Delaney's expert testimony did not distinguish between the duty to create a "program" for Johnson's care and the actual provision of medical services. Rather, the doctor's testimony supports the conclusion that the planning for care and the delivery of care are part of one unified "program" to meet the daily treatment needs of a quadriplegic. Dr. Delaney testified as to the four specific elements that are required to maintain the health of a quadriplegic: (1) skin care; (2) range of motion exercises; (3) bowel care; and (4) catheter maintenance. He said that "when you have a patient who is so debilitated, . . . that he absolutely depends on

somebody else to do everything for him, *it is standard care that you have a program to take care of all of these things.*" (Emphasis added). Therefore, based on the evidence adduced, even in the light most favorable to appellee, we cannot sustain the court's finding that the State owed Johnson a separate duty to plan for his care and confinement. To the extent that the court's determination was based on fact, it was clearly erroneous.

Because the court erroneously determined the scope of the State's duty to Johnson, and imposed liability based on the State's failure to create a treatment plan, we shall vacate the court's decision and remand the matter to that court for further proceedings. On remand, the court should consider Johnson's negligence claim in light of the evidence presented. In this regard, we note that the court did not resolve the issue of the State's relationship with PHP or the applicability of the Health Care Malpractice Claims. Md.Code Ann., Cts. & Jud. Proc. Art. §§ 3–2A–01 to 3–2A–09 (1995). If the Court determines that the State contracted with PHP, a private health care provider, and that the medical care was legally deficient, the court must also consider whether, and the extent to which, the State is liable for the negligent care and treatment provided by its contractor.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE DIVIDED BETWEEN THE PARTIES.