723 A.2d 481

Richard SHOFER

v.

The STUART HACK COMPANY, et al.

No. 209, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Jan. 27, 1999.

518

Douglas R. Taylor, Rockville, for appellant.

Janet M. Truhe (Truhe & Maier, P.A., on the brief), Towson, for appellee.

Argued before SALMON, KENNEY, and GARY I. STRAUSBERG, (Specially Assigned), JJ.

STRAUSBERG, Judge.

## INTRODUCTION

This case concerns a professional malpractice claim against a pension plan administrator. The appellant, plaintiff below, Richard Shofer ("Shofer"), was president of a used car dealership, Catalina Enterprises, Inc. ("Catalina"), trading as Crown Motors. Catalina had a pension plan, which was administered by appellee, defendant below, The Stuart Hack Company. Shofer sued The Stuart Hack Company and Stuart Hack, individually, (together, Hack) complaining that Hack was negligent in failing to give Shofer advice about the tax consequences of borrowing money from the pension fund. This Court has previously described the dispute between the parties as a "never ending litigational odyssey," on a continuous, "long, torturous trip." *Shofer v. Hack Co.*, 107 Md.App. 585, 589, 597, 669 A.2d 201 (1996). This is the third appellate opinion along that bumpy journey.[1]

---

1. The first reported appellate opinion, 324 Md. 92, 595 A.2d 1078 (1991), *cert. denied*, 502 U.S. 1096, 112 S.Ct. 1174, 117 L.Ed.2d 419 (1992), has been referred to as *Shofer I*. The second reported appellate opinion, 107 Md.App. 585, 669 A.2d 201 (1996), has been referred to as *Shofer II*. Presumably, this Opinion will be referred to as *"Shofer III."*

## PROCEDURAL HISTORY

### I.

#### A. *Shofer I*

Shofer's initial Complaint, in the Circuit Court for Baltimore City, charged Stuart Hack with (I) negligence; (II) breach of contract; and (III) common law breach of fiduciary duty. The Complaint was amended and a fourth count was added for (IV) breach of fiduciary duty under the Employees Retirement Income Security Act of 1974 (ERISA), as codified in 29 U.S.C. §§ 1001 *et seq.* Hack moved to dismiss count IV for lack of subject matter jurisdiction, which was later granted with leave to amend. Shofer then amended his Complaint to include the original three claims and five other claims for damages due to Hacks failure to provide competent advice under ERISA, specifically, 29 U.S.C. § 1132(a)(1)(B). Hack moved for a dismissal of the Second Amended Complaint on the ground that ERISA claims fall under the exclusive jurisdiction of the federal courts. On October 12, 1990, the trial court dismissed the Second Amended Complaint on the ground that the claims were preempted by the federal ERISA statute.

Shofer appealed to the Court of Special Appeals, and before the case was heard, the Court of Appeals issued a writ of certiorari, upon its own motion. On September 17, 1991, the Court of Appeals (Rodowsky, J.), reversed in part and vacated in part, holding that the Maryland state law claims survived the ERISA claims because ERISA does not preempt traditional common law causes of action. *Shofer v. Stuart Hack Company*, 324 Md. 92, 595 A.2d 1078 (1991), *cert. denied*, 502 U.S. 1096, 112 S.Ct. 1174, 117 L.Ed.2d 419 (1992)(*Shofer I*). The Court of Appeals also held that Shofer could recover damages based on income tax penalties; however, the Court barred recovery of other claimed consequential damages, specifically, all pension-related damages including excise taxes, prohibited transaction penalties, and possible plan disqualification. The case was remanded for further proceedings on the remaining claims.

## B. *Shofer II*

Shofer filed a Third Amended Complaint for negligence and breach of contract seeking damages for future additional income tax, excise tax, interest, penalties, attorneys fees, accountants fees, loss of income, prohibited transaction penalties and possible disqualification of the pension. Hack moved for dismissal citing *Shofer I*, arguing that the Court of Appeals specifically held these damages non-recoverable for negligence and breach of contract actions. *Shofer I*, 324 Md. at 111, 595 A.2d 1078. The trial court, applying *Shofer I*, dismissed the damage claims for excise taxes, prohibited transactions, and plan disqualification under counts I and II of the Third Amended Complaint. The punitive damages and attorneys fees claims were also dismissed.

Shofer amended his Complaint and claimed damages from penalties arising out of his failure to follow proper procedures in borrowing from his pension, damages due to his inability to refinance his Virgin Islands property, lost salary, and lost business profits. *Shofer v. Stuart Hack Company*, 107 Md. App. 585, 590, 669 A.2d 201 (1996) (*Shofer II* ). Hack moved for summary judgment arguing preemption by ERISA, or, in the alternative, partial summary judgment as to damages. Partial summary judgment was granted as to certain damages claimed.

Subsequently, the trial court dismissed the damage claim for loss of sheltered earnings because it was too speculative and unforeseeable, but denied a motion to dismiss the tax penalties and interest damages. Shofer announced his intent to appeal the previous orders disallowing the damage claims regardless of the outcome of the trial. Pursuant to Maryland Rule 2–602(b),[2] the trial court entered a judgment as to all the

---

2. Rule 2–602. Judgments Not Disposing of Entire Action

rulings on damages, thereby giving its permission to Shofer to appeal the damage issues to this Court before the start of the trial on the merits. *Shofer II,* 107 Md.App. at 591, 669 A.2d 201. This Court dismissed that appeal, holding that "the Circuit Court erred in certifying for appeal these interlocutory orders that were neither final judgments nor exceptions to the final judgment rule." *Id.* at 586, 669 A.2d 201. We remanded the case for "trial on the remaining damage items." *Id.* at 597, 669 A.2d 201.

## II.

Shofer's Fourth Amended Complaint was filed after the *Shofer II* decision. Shofer requested a jury trial for the first time and, pursuant to his interpretation of the Court of Appeals decision in *Shofer I,* reasserted all the previously dismissed damage claims to the original breach of contract and negligence counts. He also filed a Motion for Revision seeking a reversal of each of the prior damage rulings. Hack filed a Motion to Strike the Fourth Amended Complaint on the grounds that Shofer was not entitled to a jury because the amended Complaint simply reformulated the original.

Shofer amended his Complaint a fifth time, alleging negligence, breach of contract, and a new count for fraud and deceit. Hack filed a Motion to Strike the Complaint claiming the new count was time barred.

Shofer then filed a new lawsuit alleging negligence, breach of contract, and fraud, asserting that the new case was viable because it requested damages for "excise taxes" that the IRS had recently assessed. Hack moved for summary judgment as to the new suit on the grounds that *Shofer I* found these

---

(b) When Allowed—If the court expressly determines in a written order that there is no just reason for delay, it may direct it in the entry of a final judgment:

 * * *

(2) pursuant to Rule 2–501(e)(3), for some but less than all of the amount requested in a claim seeking money relief only.

damages unrecoverable. Hack also filed a Motion for Sanctions on the ground that the new lawsuit was filed in bad faith.

The circuit court denied Shofers Motion for Revision of the prior damages rulings. The court granted Hacks Motion to Strike the Fourth and Fifth Amended Complaint and granted Hacks Motion for Summary Judgment with respect to the newly filed case. The Motion for Sanctions against Shofer was denied.

Finally, on June 26, 1997, a bench trial began on the remaining negligence and breach of contract claims. After a lengthy bench trial (Matricciani, J.), the lower court found in favor of Hack. The trial court concluded that Hack did not deviate from the acceptable standard of care, in large part based on the duty Hack owed Shofer under the particular circumstances of this case; that Hack did not cause Shofer's damages; and that, in any event, Shofer was contributorily negligent. Shofer appeals all of the pretrial rulings as well as the findings of fact and conclusions of law set forth in the Memorandum and Order dated September 5, 1997.

## FACTUAL BACKGROUND

Catalina, through Shofer, as president, established a pension plan ("Plan") in the late 1960's for its employees. The Hack Company, a pension consulting and administration firm, was hired by Catalina to administer the Plan. Stuart Hack was the owner and an employee of the Hack Company.

In the mid 1970's, Shofers personal and business accounting firm, Grabush, Newman and Company ("Grabush"), suggested that Shofer contact Hack for revisions to the Plan in order to bring it into compliance with the newly-enacted federal legislation, ERISA. Hack performed these duties and continued as Catalinas Plan administrator until 1986. During this time, Hack renewed its contract with Catalina by letter addressed solely to "Catalina Enterprises, Inc."

In 1982, Shofer was under increased pressure from Maryland National Bank to improve the balance sheet of Catalina t/a Crown. Shofer began to contact Hack more frequently,

and inquired about using the Plan to finance Catalinas accounts receivable. Shofer, in fact, did finance Catalinas accounts receivable with Plan funds.

On August 3, 1984, Shofer called Hack, and in a brief telephone conversation inquired about three items: (1) whether the funds in the Catalina Enterprises Plan could be used as collateral for loans; (2) whether Shofer could borrow money from the Plan; and (3) whether Shofers voluntary account could be given special treatment for purposes of these loans. Shofer did not indicate the amount he intended to borrow, the number of loans, the reasons for obtaining the loans, or whether he intended to follow through with the inquiry. Hack informed Shofer that he could borrow up to 100% of his voluntary account. Soon after, Hack contacted Barry Berman, a pension attorney at the law firm of Weinberg & Green, who confirmed that Shofer could borrow up to 100% of his voluntary account.

Shofer called Hack again on August 7, 1984, and stated that he needed a letter confirming the advice Hack had provided in the previous telephone conversation, namely that: (1) Shofer could borrow up to 100% of his voluntary account, and (2) the voluntary account could be used as collateral for a bank loan. On August 9, 1984, before Shofer received Hacks confirmation letter, he borrowed $60,000 from the Plan to repay part of the debt he owed to Catalina t/a Crown, which could then, in turn, repay Maryland National Bank and receive a line of credit to purchase additional inventory. To process the loan, Shofer wrote himself a check from the pension, issued a pay-on-demand promissory note to the Plan, and set the interest rate himself. At this point, he did not secure the loan nor did he inquire of Hack how much he could borrow. Shofer later repaid this initial loan.

On August 9, 1984, Hack prepared the requested letter, which stated:

> You questioned whether assets of your money purchase pension plan and profit sharing plans can be used as collateral for loans, whether you can borrow against these plans

and whether there is any special treatment for your voluntary account under these plans.

First of all, let's distinguish between the voluntary account and the employer account. The employer account cannot be put up as collateral for a loan, and loans to participants against their employer account are limited to a total of $50,000 for all plans up to a maximum of five years (For a longer period of time if used for the purchase or substantial improvement to a primary residence). Further, we would recommend that any loans against an employer account should be fully collateralized (this means collateral in addition to the value of the account itself).

There is an entirely different treatment for voluntary accounts. First, there is no limit on the amount that can be borrowed against the account or the length of time for which it can be outstanding. Also, the account itself can stand as collateral for a loan from a bank to another source. The loan agreement will have to include a provision that you cannot withdraw money from your voluntary account, and thus dissipate the collateral however.

The law is pretty clear on the inability to use employer account values as collateral for a loan. There is no law on restrictions of using voluntary money for collateral for a loan. The TEFRA provisions on the limits on loans apply only to employer accounts and specifically do not apply to employee voluntary accounts. In my opinion, you can use your voluntary account as collateral for a loan or you can borrow up to 100% of your voluntary account.

The gravamen of Shofers complaint is that the letter fails to provide advice about the tax consequences of borrowing money from the pension fund.

At the time the letter was written, Shofers voluntary account consisted of $76,000. According to Hacks letter, Shofer could borrow $50,000 from the employer account and $76,000 or 100% of his voluntary account, for a total loan of $126,000.

Shofer took the following loans from the Plan between 1984 and 1986, totaling $315,000 (excluding the initial $60,000, which was repaid):

1. $150,000 on August 23, 1984, to repay his debt to Catalina t/a Crown.

2. $50,000 on September 5, 1984, to repay his debt to Catalina t/a Crown.

3. $35,000 on February 21, 1985, as a down payment on two investment properties in the Virgin Islands.

4. $3,000 on February 25, 1985, also for the Virgin Islands properties.

5. $12,000 on July 30, 1985, to furnish the Virgin Islands properties.

6. $25,000 on August 13, 1985, to refurbish the Virgin Islands properties.

7. $5,000 on August 21, 1985, again to refurbish the Virgin Islands properties.

8. $35,000 on September 30, 1986, to purchase a condominium at Harbor Court in Baltimore.

Shofer did not inform Hack or Grabush about the loans he had taken from the Plan. Throughout, Grabush was the accounting firm for Shofer, individually, Catalina, and Catalinas pension plan.

In the fall of 1986, Grabush prepared Shofer's 1985 personal income tax returns and did not list the 1985 loans from the Plan as taxable income. On June 17, 1985, Kenneth Larash ("Larash"), who prepared Shofer's personal and income tax returns, was reviewing the general ledger of the pension plan and he learned of the loans taken in 1984 that were not reported as income. He did not recommend that any action be taken nor did he advise Shofer that the loans should have been reported as income. This failure to report the loans was not discovered until 1986 when another Grabush accountant, Alan Marvel ("Marvel"), was reviewing Shofers file and noticed the omission. Larash, Shofer, and Marvel met. The two accountants suggested Shofer contact a pension attorney,

Nicholas Giampetro. Shofer complied and also wrote to Hack requesting his assistance.

At this point, Hack learned of Shofers loans for the first time. Another meeting was held in May 1987, between Shofer, Hack, Marvel, and Larash, in which Hack reaffirmed his position that the loans were not taxable. Hacks advice to Shofer was to refrain from amending his 1984 and 1985 tax returns, as the loans might not be detected by the IRS and the statute of limitations had almost run. Marvel and Larash disagreed, advising Shofer to file amended returns reporting the loans as income. Shofer amended his 1984 and 1985 tax returns and reported the loans as income on his 1986 tax return. These actions resulted in additional federal and state taxes, penalties, and interest charges.

The question presented in this appeal for our review is whether the trial court was clearly erroneous in concluding (1) Hack did not breach the standard of care in not advising Shofer about the tax consequences of his borrowings from the Catalina pension fund; (2) if there were a breach, it was not the proximate cause of Shofer's losses; and (3) Shofer was contributorily negligent in failing to inform Hack about the extent of the pension fund loans he was taking, and in failing to inform his accountants about his borrowings.

## DISCUSSION

On an appeal from a bench trial, Maryland Rule 8–131© provides that, "[w]hen an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous . . . ." "Therefore, if 'competent material evidence' supports the trial court's findings, we must uphold them and cannot set them aside as 'clearly erroneous.'" *State v. Johnson,* 108 Md.App. 54, 71, 670 A.2d 1012 (quoting *Nixon v. State,* 96 Md.App. 485, 491–92, 625 A.2d 404, *cert. denied,* 332 Md. 454, 632 A.2d 151 (1993)) (internal quotations omitted). With respect to the lower court's application of the law to the facts, we apply the

abuse of discretion standard. *Oliver v. Hays,* 121 Md.App. 292, 307, 708 A.2d 1140 (1998); *Pierce v. Montgomery County,* 116 Md.App. 522, 529, 698 A.2d 1127 (1997).

# I

## *Standard of Care*

■ To establish a cause of action for negligence, the following must be proven: (1) that the defendant owed a duty to the plaintiff or to a class of which the plaintiff was a member; (2) that the defendant breached the duty; (3) that the plaintiff suffered actual injury or loss; and (4) that the loss or injury proximately resulted from the defendant's breach of the duty. These four elements have been long established as the factors necessary to create a cause of action in negligence. *See* W. Page Keeton et al., *Prosser and Keeton on The Law of Torts,* § 30, at 164–165 (5th ed.1984); *Rosenblatt v. Exxon,* 335 Md. 58, 642 A.2d 180 (1994).

In *Jacques v. First National Bank,* 307 Md. 527, 515 A.2d 756 (1986), which imposed upon a bank a duty to exercise reasonable care in processing and determining a loan application, the Court of Appeals set forth additional criteria applicable to a negligence economic injury claim:

> In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. The intimate nexus is satisfied by contractual privity or its equivalent.

*Jacques,* 307 Md. at 534–35, 515 A.2d 756; *Noble v. Bruce,* 349 Md. 730, 739, 709 A.2d 1264 (1998). Catalina, and not Shofer, was Hacks client. There was no contractual privity between Shofer and Hack.

As a Plan participant, Shofer was a third-party beneficiary of the Hack–Catalina contractual arrangement. When two parties enter into an agreement with the intent to confer a direct benefit on a third party, a duty is created that allows the third party to sue on the contract despite the lack of privity. *Flaherty v. Weinberg,* 303 Md. 116, 125, 492 A.2d 618 (1985). For a third party beneficiary claim to succeed, the plaintiff must be a part of the class of persons specifically intended to be ... beneficiar[ies] of the defendant's undertaking. *Id.* at 131, 492 A.2d 618 (citing *Clagett v. Dacy,* 47 Md.App. 23, 420 A.2d 1285 (1980)).

Professional malpractice is one genre of negligence. Once it is established that defendant owed plaintiff a duty, plaintiff must prove that defendant, whether a physician, lawyer, architect, accountant, or pension administrator, breached the standard of care applicable to other like professionals similarly situated. Furthermore, plaintiff must prove defendant's breach of the standard of care caused the damages sustained by plaintiff. *Reed v. Campagnolo,* 332 Md. 226, 232, 630 A.2d 1145 (1993) ("the burden of proof in a malpractice case is on the plaintiff to show a lack of the requisite skill or care on the part of the physician and that such want of skill or care was a direct cause of the injury." *Suburban Hosp. Assn. v. Mewhinney,* 230 Md. 480, 484–485, 187 A.2d 671 (1963)). *Flaherty,* 303 Md. 116, 128, 492 A.2d 618 (1985) (In order to state a cause of action for legal malpractice, a plaintiff must allege three elements: (1) the attorneys employment, (2) his neglect of a reasonable duty, and (3) that such negligence resulted in and was the proximate cause of loss to the client).

Shofer was a participant in the Pension Plan administered by Hack. The standard of care owed to a third party beneficiary must be based on the contract of the primary relationship. Here, that relationship was based on an agreement for the administration of pension benefits, *not* tax advice.

Both parties presented expert witnesses who testified as to the standard of care required of a pension plan adminis-

trator. Shofers expert, Edward Kabala ("Kabala"), an attorney practicing in the State of Pennsylvania, testified that the standard of care applicable to a pension attorney is also applicable to a pension consultant. In the same testimony, however, Kabala testified that to be a plan administrator, one need not be an attorney. Kabala testified that Hacks advice fell below the acceptable standard of care because he failed to provide tax advice.

Hack presented the expert testimony of Edward Burrows, past president of the American Society of Pension Actuaries, who has made a career of performing pension consulting and administrative services. Burrows testified that in light of the brief telephone inquiry, Hack did not owe a duty to provide advice concerning tax consequences of the loans. Hack also presented Richard Itner, a Baltimore accountant, as an expert who testified that Grabush was negligent in preparing Shofers 1984 and 1985 tax returns and also negligent in failing to advise Shofer of his option not to file an amended tax return. The trial judge, who was able to observe these experts and assess their credibility, found the testimony of Hacks experts credible, as he adopted much of their testimony in his Findings of Fact.

■ Although Shofer may sue as a third party beneficiary, his claim fails because Hack *did* in fact provide the appropriate services and met the standard of care required of a pension plan administrator. To require a pension plan administrator to provide tax advice, as if he were a tax attorney or accountant, would be to require pension plan administrators to perform dual roles as administrator and tax advisor. *Selden v. Burnett,* 754 P.2d 256 (Alaska 1988), is instructive, to a limited degree. In that case, the Court refused to hold an accountant liable for recommending a particular investment in the course of giving tax advice. There, the Court addressed an accountants duty of care to a third party who received the accountants recommendation through a client. The recipient of the investment advice who sustained losses sued the accountant for negligent advice. The Court was not prepared to

expand unduly the accountants duty, and hold that a pension plan administrator should be held to the same standard applicable to an attorney or accountant unless he represents himself as an attorney who provides legal advice or an accountant who provides tax advice.

■ Shofer regularly conferred with his accountants at Grabush for personal and business-related tax matters. Shofer could not be expected to rely solely on Hack for tax advice. Shofer did not specifically retain Hack to provide consultation on the advisability of borrowing substantial sums of money from the pension funds for the purpose of personal purchases or investments. Hack was the Plan administrator. The Restatement (Second) of Torts, Section 552, provides, in part:

(1) one who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) ... [T]he liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(Emphasis added).

Shofer could not have been expected justifiably to rely on Hacks advice to borrow the pension funds he did. Hack complied with the standard of care required of a pension plan administrator.

## II

### *Proximate Cause*

Even if a duty existed, which Hack breached, any damage sustained by Shofer must be directly attributable to Hacks actions. The plaintiff must prove that the negligent actions of the defendant actually caused the plaintiff to be injured. *Peterson v. Underwood,* 258 Md. 9, 17, 264 A.2d 851 (1970). In order to establish proximate cause, the injury must also be a foreseeable one.

■ Shofer had the burden of introducing evidence establishing a reasonable probability or likelihood that the defendant's act caused the plaintiff's injury or damage. *Id.* at 17, 264 A.2d 851. He did not do so. Shofer failed to provide evidence supporting the claim that "but for" Hacks actions, Shofer would not have incurred damages. As the trial court recognized, Shofer borrowed from his pension at a time when he was in debt to Catalina and was under pressure from Maryland National Bank to make progress on Catalina's balance sheet.

At the time of Shofers telephone inquiry, the losses that were later sustained could not have been foreseen by Hack. Shofer did not inform Hack: (1) that he actually intended to borrow from the pension; (2) the reasons for borrowing; (3) the amount he would borrow; and (4) when and if Shofer intended to repay the loan. Hack was justified in treating the telephone conversation as an inquiry and providing the advice memorialized in the letter dated August 9, 1984. Shofer's subsequent losses were not reasonably foreseeable by Hack. The trial court characterized Shofers inquiry to Hack as "hypothetical," which appears to be an apt characterization, certainly not one which this Court would conclude was clearly erroneous—the governing standard on appeal.

Shofer acted on Hacks advice, without disclosing to him the extent of his pension fund borrowing. This Court cannot conclude that the trial court was clearly erroneous in finding that the amount of the borrowing "went beyond the scope of

the advice sought or given," that the losses were not foreseeable, and, in inferring "that Shofer was attempting to conceal the existence of his transaction with the pension plan." We affirm the trial court's findings that Shofer did not "sustain his burden of proving that Hacks negligence was the proximate cause of Shofers injuries."

## III

### *Contributory Negligence*

A plaintiff is contributorily negligent when he fails to exercise ordinary and reasonable care for his own protection. *Menish v. Polinger Co.*, 277 Md. 553, 356 A.2d 233 (1976).

The trial court found that Shofer was a "sophisticated businessman who was aware of the complicated interplay between the tax code and pension law." Shofer borrowed $315,000 from the pension funds based upon a brief conversation with a pension administrator, without checking with his accountant. Much of Shofers argument on appeal is directed at the trial judge's conclusion that Shofer must have known that his loans from the pension were taxable events. In our analysis, we disregard that particular finding of the trial judge and assume that Shofer did not actually know that the loans were taxable. Nevertheless, Shofer failed to act reasonably. He did not inform Hack of his intent to follow through with the inquiry, if at all. He did not inform Hack of the extent to which he intended to borrow from the pension. A reasonable person would have provided such vital information if the advice was later to be acted upon.

Shofer had accountants, with whom he had an ongoing relationship. Before taking $315,000 of loans from a pension, a reasonable person standing in Shofers shoes would have ascertained the tax consequences with his accountant and would not have acted as he did based solely on a brief conversation with a pension administrator. By taking such large loans and not informing Hack more specifically or

consulting his own accountants at all, Shofer contributed to the losses he later sustained.[3]

Shofer criticizes the trial judge for stating that Shofer seemed deceitful in concealing the extent and reasons for his borrowing from the pension. Given the continuous removal of pension funds without further disclosure to the appellee, the trial judges characterization was not unreasonable or unsupported.

## CONCLUSION

Appellant also assigns errors to several pretrial rulings, by different judges, which disallowed numerous items of claimed damages.[4] Given this Court's affirmance of the trial court's resolution against appellant of the liability issue, there is no need to discuss damages.[5]

---

**3.** The trial judge seemed to confuse the doctrines of contributory negligence and assumption of risk. They are distinct. The former focuses on whether the plaintiff failed to exercise ordinary care, determined by what a reasonable person in the plaintiff's position would do under similar circumstances. The latter focuses on whether the plaintiff knew of a danger and voluntarily did what he did despite knowing it was dangerous, thus assuming the risk of injury. By not revealing the extent of his loans, by borrowing way in excess of $126,000, by not consulting with his accountants as to tax consequences of the loans, Shofer was negligent, contributorily so. *Compare Baltimore Gas & Elec. Co. v. Flippo*, 348 Md. 680, 703, 705 A.2d 1144 (1998) *with Liscombe v. Potomac Edison Co.*, 303 Md. 619, 630, 495 A.2d 838 (1985).

**4.** Judge Wards February 17, 1993, ruling applied *Shofer I* and dismissed the damage claims for excise taxes, prohibited transactions, plan disqualification, punitive damages, and the request for attorneys fees; Judge Hollander's July 11, 1994, ruling granted partial summary judgment as to damages arising from appellants failure to follow proper procedures in borrowing from the pension, damages due to his inability to refinance his Virgin Islands property, lost salary, and lost business profits; and Judge Davis January 31, 1995, ruling dismissed the damage claim for loss of sheltered earnings.

**5.** The protracted nature of this litigation is evidenced by the number of trial judges who are no longer on the bench whose rulings are now appealed. Judges Ross and Ward have retired; Judge Davis is a federal district court judge; Judge Hollander is a member of this Court.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.