779 A.2d 970

George KNAPP et al.

v.

Raymond S. SMETHURST, Jr. et al.

No. 2615, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Aug. 30, 2001.

678

680

Cynthia E. Young (Alan W. Bernstein and Bernstein & Feldman, P.A., on the brief), Annapolis, for appellants.

Raymond S. Smethurst, Jr. (Adkins, Potts & Smethurst, LLP, on the brief), Salisbury, for appellees.

Argued before DAVIS, HOLLANDER, and CHARLES E. MOYLAN, Jr. (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

This case has its genesis in the failure of various corporate and financial entities. Our task is to determine whether two residential lots located in the Harbor Pointe development in Salisbury, one owned by appellants George and Nancy Knapp, the other by appellants Milankumar and Miraben Shah, are subject to a second foreclosure action against Wyemoor Development Corporation ("Wyemoor"), with regard to an alleged debt of $2,340,709.60.[1] The first foreclosure action was initiated in 1992 against Wyemoor by Second National Federal Savings Bank ("Second National" or the "Bank"), and resulted in a deficiency of approximately $2.25 million dollars. The second foreclosure proceeding was filed on February 24, 1998, in the Circuit Court for Wicomico County, by Raymond Smethurst, Jr. and Robert Taylor, appellees, substitute trustees appointed by The Reliant Group, L.P. ("Reliant"), the successor-in-interest to Second National, and the holder of deeds of trust executed by Wyemoor in favor of the Bank with regard to property in Harbor Pointe.

On March 10, 1998, appellants sought to intervene in the underlying foreclosure action because their properties, lots 29 and 30, which are now improved by their homes, were allegedly subject to the deeds of trust, but were not included in the first foreclosure action. The circuit court granted appellants' motion to intervene on March 12, 1998, and temporarily stayed the foreclosure sale. After a hearing on December 1, 1999, however, the circuit court declined to grant relief to appellants. Accordingly, they noted this appeal. Appellants present several issues for our consideration, which we have reordered and rephrased:

I. Was the trial court clearly erroneous in finding that full payment of the debt had not been made to the Bank for lots 29 and 30?

---

1. Neither the record nor the record extract contains a copy of the underlying foreclosure suit.

II. Did the 1992 foreclosure sale brought by Second National, which was conducted without notice to appellants, deprive appellants of a property interest, in violation of the Due Process Clause of the Fourteenth Amendment?

III. Does the doctrine of unjust enrichment prevent appellees from foreclosing against lots 29 and 30 for the entire mortgage debt, given that the lots are now improved by homes, and Second National initially anticipated a payoff of $27,922.88 for the two unimproved lots?

IV. Are appellees barred by laches or equitable estoppel from enforcing the obligation against appellants, because neither appellees nor their predecessors in interest sought to foreclose on lots 29 and 30 until 6½ years after Wyemoor's default?

We answer Questions I and II in the affirmative and shall therefore reverse. Accordingly, we decline to address Questions III and IV.

## FACTUAL BACKGROUND

The underlying facts are largely undisputed, and were presented below by way of a "Joint Stipulation of Facts" ("Stipulation"). The Stipulation included 45 exhibits.[2]

The Shahs and Knapps are the owners, respectively, of lots 29 and 30 in Block A, Harbor Pointe Phase II, Section 1, a

---

2. The Stipulation provides that the facts set forth therein are based upon documents found in the files of Second National (now in the possession of Reliant), Land Title Research of Maryland, Inc. (now in the possession of the Maryland Attorney General's Office), and the deposition testimony of Stephen A. Beene, an asset manager with Fidelity Partners, Inc., and Edward D. Woodland, a former asset manager with Second National.

In our factual summary, we have incorporated, almost verbatim, most of the content of the Stipulation, with only minor editorial and organizational changes. We have also supplemented the Stipulation to include factual matters that occurred after the parties submitted the Stipulation to the trial court.

residential community located in Salisbury. As we noted, appellees are the substitute trustees appointed by Reliant, the successor-in-interest to Second National and the holder of deeds of trust executed by Wyemoor with respect to the Harbor Pointe property. Wyemoor developed Harbor Pointe from 1988 to 1992.

Second National was the beneficiary of a revolving loan deed of trust dated September 7, 1988, a revolving loan second deed of trust dated July 7, 1989, and a consolidated and modified revolving loan second deed of trust dated July 7, 1989, which secured a $3,000,000 revolving loan from the Bank to Wyemoor. In connection with the loan transactions, the Bank had liens against the Harbor Pointe property, including lots 29 and 30. In addition to the Bank's lien, Wyemoor's Harbor Pointe project was subject to three other liens as of November 12, 1991: a deed of trust to American Paving Corp. ("American Paving"), dated February 5, 1991; a judgment of $356,434.25 in favor of the Bank of Maryland; and an indemnity deed of trust to the Bank of Maryland, dated September 6, 1991.

On November 12, 1991, Land Title Research of Maryland, Inc. ("LTR") held settlement on the sale of lots 29 and 30 from Wyemoor to the builder, Harbor Pointe Limited Partnership ("HPLP"). In consideration of $41,800, Wyemoor executed a deed to HPLP for lots 29 and 30, recorded in the land records of Wicomico County. Shortly before that settlement, on November 7, 1991, "Laura" at LTR faxed to "Sherry" at Second National a request for "partial release/payoff figures" for lots 29 and 30. The next day, "Sherri"[3] faxed "Laura" a memo stating that Second National would accept as a payoff "100% net proceeds." Thus, Second National agreed to release its lien against lots 29 and 30 in return for the net proceeds of the transaction.

The settlement statement reflects that HPLP executed a $244,000 first mortgage to Reisterstown FSB, and a $10,475

---

**3.** The Stipulation contains two different spellings for the name.

second mortgage to Wyemoor, to finance the purchase of the two lots and the construction of residences on them. It also reveals that, from the settlement proceeds, LTR, the settlement agent, was to pay $3,000 to American Paving as the holder of a "second mortgage," and net proceeds of $27,922.88 to Second National, holder of the first deed of trust mortgage. Although lots 29 and 30 were sold to HPLP, they were not released by the Bank.

Significantly, LTR's file does not contain a copy of any check or document purporting to transmit funds to Second National pertaining to lots 29 and 30. Moreover, LTR's file contains an unsigned "Partial Release of Deed of Trust" pertaining to the lots, but the file is devoid of any evidence that the document was ever sent to, received by, or executed by Second National. Similarly, Second National's files do not contain any documents evidencing the receipt of proceeds of $27,922.88, or a request from LTR for a partial release, or a copy of the unexecuted Partial Release of Deed of Trust found in the LTR file.

In contrast, LTR's file contains correspondence transmitting a $3,000 check to American Paving's attorney, William Smith, "to release the above-referenced lots from the deed of trust held by [American Paving]" and requesting that he forward "a partial release." American Paving's partial release of lots 29 and 30 was subsequently recorded on January 21, 1992, pursuant to LTR's request. The releases of Wyemoor as to lots 29 and 30 have also been recorded.

Additionally, the LTR file contained an executed but unrecorded "Partial Release of Deed of Trust," and an executed but unrecorded "Partial Release of Judgment," both dated July 31, 1992, pertaining to the Bank of Maryland liens. They were in LTR's file when it was placed in receivership on December 16, 1994, and were found by the receiver following the commencement of this litigation. On January 8, 1998, the two partial releases were forwarded to the title insurer that had issued the title policies. Apparently, they are still in the

possession of Fidelity National Title Insurance Company ("Fidelity").

Second National's business records included ledger cards, on which the Bank tracked the receipts and disbursements pertaining to the Wyemoor loan. Edward Woodland, a former asset manager of Second National who began work at the Bank in October 1991, testified at his deposition that the Bank maintained computer records of its receipts and disbursements, which were more accurate than the ledger cards. Unfortunately, the parties have no knowledge as to the whereabouts of the computerized records.

The ledger cards in Reliant's possession relating to the Wyemoor loan pertain to the period from the inception of Second National's loan on September 7, 1988, through July 23, 1992. The cards reflect the receipt of funds for all lots conveyed by Wyemoor prior to 1992, with the exception of lots 29 and 30. For lots conveyed by Wyemoor after January 1, 1992, the settlements of which were handled by LTR, the ledger cards reflect receipt of funds for lots 64 and 75 in January 1992, but do not reflect the receipt of proceeds with respect to the conveyance of lots 23 and 25 in March 1992, or lot 21 in June 1992. LTR's check to Second National for the release of lots 23 and 25, dated March 24, 1992, was not mailed to Second National until May 1, 1992. Moreover, a check for the release of lot 21 was found among the records of LTR, and a release of this lot has been recorded. Another accounting ledger in Second National's files, pertaining to the period of June 18, 1991 to April 28, 1992, also failed to reflect the receipt of any funds with respect to lots 29 and 30.

Woodland's duties as an asset manager included monitoring non-performing, troubled loans, evaluating the loans, and disposing of the assets at foreclosure. He was not assigned to the Wyemoor loan, however, until after the settlement on lots 29 and 30 in November 1991. At his deposition, Woodland testified that when he began working for the Bank, he found Second National's practices to be "loose," and the Wyemoor loan non-performing, with the developer having trouble repay-

ing the debt. Accordingly, he attempted to institute tighter controls over the 20–25 loans that were assigned to him, including the Wyemoor loan.

As asset manager, Woodland said that he would have performed the following tasks in reference to the Wyemoor loan:

(a) A review of the loan documents and all correspondence;

(b) A visual inspection of the property;

(c) Taken an inventory of the assets that were still subject to the bank's security;

(d) Examined the releases in the file and/or the notes in the file regarding the release.

Woodland did not recall that anything was amiss or out of order. He had no personal knowledge, however, as to whether the Bank received the settlement proceeds with regard to lots 29 and 30, or whether the Bank executed releases as to those lots.

On April 10, 1992, HPLP conveyed lot 30 to the Knapps, along with the new residence it had constructed, located at 1408 East Upland Drive. Settlement was conducted by LTR, and the deed was recorded. The Knapps' purchase was financed by a loan in the amount of $141,200, secured by a deed of trust to Capitol Mortgage Bankers, Inc.[4] The settlement statement discloses a purchase price of $148,700, with $120,258.74 allocated to the first mortgagee, Reisterstown FSB, and $5,454.15 for the second mortgagee, Wyemoor.

An LTR check for $120,258.74 was prepared, but apparently it was superseded by a check for $120,572.54. No release of Reisterstown FSB's deed of trust was recorded at the time of settlement with the Knapps. The payment of $5,465.15 to Wyemoor may have been included in a check for $6,285.11 payable from LTR to HPLP, dated April 11, 1992. No release of its deed of trust was recorded at that time, however.

---

4. Contrary to the Stipulation, the Motion to Intervene, which is in the record, states that the Knapps obtained their mortgage from Temple–Inland Mortgage Co.

On June 11, 1992, by recorded deed, HPLP conveyed lot 29 to the Shahs, along with the new residence that it built on the lot. Their address is 1406 East Upland Drive. The Shahs' purchase was financed by a loan of $139,500, secured by a deed of trust to Capitol Mortgage Bankers, Inc. LTR conducted the settlement, and the settlement statement discloses a purchase price of $155,000, with $106,722.12 allocated to pay off the first mortgagee, Reisterstown FSB. No release of Reisterstown FSB's lien was recorded, however. In addition, $5,556.50 was allocated to the second mortgagee, Wyemoor.

On June 30, 1992, about three weeks after the settlement for the sale of lot 29 to the Shahs, and almost three months after the Knapps' settlement, Reisterstown FSB executed a Release Of Purchase Money Mortgage to HPLP and Lloyd Tillman,[5] which released lots 29 and 30. This release was not recorded, however. It was located in the files of "Land Title Research of Maryland, Inc. In Receivership," and is now in possession of Fidelity.

Wyemoor and Second National executed a "Loan Modification Agreement" on July 1, 1992, which contained a schedule of completed sales, setting forth the lot number sold, the name and address of the purchaser, and the purchase price. This schedule, and all the other schedules purportedly attached to the agreement, are missing.

On July 2, 1992, LTR remitted to Second National its check for $5,237.50, specifically designated as "Lot 29, Harbor Pointe Principal Payment," which may represent payment on the Wyemoor second mortgage with respect to lot 29. Second National's ledger does not reflect receipt of this check, however, and no release of this second mortgage lien was recorded.

On July 13, 1992, about a month after LTR handled the settlement on the resale of lot 29 to the Shahs, and several months after the Knapps' settlement, Wyemoor executed a Release of Purchase Money Mortgage to HPLP and Lloyd

---

5. We have not been advised as to Tillman's involvement in any of the transactions.

Tillman, which released lots 29 and 30. This release has not been recorded, has been located in the files of "Land Title Research of Maryland, Inc. In Receivership," and is now in possession of Fidelity.

In the Fall of 1992, Second National determined to foreclose on its loan to Wyemoor. According to Woodland, it was the Bank's intention to foreclose on "all the property that [it] had a security interest in." Woodland testified that he interacted with the Bank's loan servicing department to ascertain and identify the Bank's remaining collateral. That interaction included visiting the loan servicing department "to determine what was originally [B]ank security less anything that had been released." When the Bank ascertained the property in which it had a security interest, it gave a list to its attorneys, "so that they would include all those properties in the foreclosure."

Second National's files contained a copy of a tax map that had been marked to indicate which lots were thought to be still owned by Wyemoor and thus subject to the Bank's security interest. According to the map, after November 1991, Second National no longer retained a security interest in lots 29 and 30, because those lots were not marked. Additionally, the Bank used a plat of Harbor Pointe to identify what lots Wyemoor owned, in order to determine what property taxes had to be paid. According to Woodland, the map indicated that lots 29 and 30 had been released. Woodland believed that the document was prepared from tax bills.

Further, Second National commissioned Trice Appraisal, Inc. ("Trice") to render an appraisal of the remaining Wyemoor lots, for the purpose of establishing their market value as collateral for the Wyemoor loan. It was received and dated March 2, 1992. The property description that was attached to the appraisal did not include lots 29 and 30.[6] Woodland

---

6. Appellees assert in their brief that the reason lots 29 and 30 were not identified on the plat, tax map, or in the Trice appraisal, was because they had been sold to HPLP, and were no longer held in Wyemoor's name.

believed, however, that all the collateral that the Bank still retained was set forth in the property description attached to the appraisal. Because lots 29 and 30 were not included in the property description, Woodland stated that "it appeared the bank didn't have a collateral position on the two lots."

A handwritten document prepared by Second National, titled "Comparison of Harbor Pointe Phase II Section 1 lots Conveyed and Retained as of January 31, 1992," is consistent with Woodland's belief. It appears to catalogue the status of the Wyemoor lots, and specifically states that lots 29 and 30 were "conveyed." It also notes that those two lots, and others, were not included in the Trice appraisal.

Second National filed the first foreclosure action against Wyemoor on November 4, 1992, Case No. 93–CV0502, in the Circuit Court for Wicomico County. Woodland coordinated the foreclosure and represented the Bank at the sale. He testified that the Bank foreclosed on all the property in which it believed it held a security interest. It is undisputed that lots 29 and 30 were not included in the foreclosure. According to Woodland, if the Bank believed it had a security interest in lots 29 and 30, those lots would have been included in the sale.

Although Woodland did not recall if anyone ever questioned whether lots 29 and 30, or lot 68, should be included in the foreclosure, he recalled discussions concerning the recreation parcels, which he understood were to be included in the sale. Woodland said that Second National

tried to be diligent and make sure that we foreclosed on everything that the [B]ank believed [it] had an interest in. And if property wasn't included in the foreclosure, it was generally the [B]ank's position that [it] didn't have a security interest in it.

Wyemoor still held, in its name, lot 68 as well as the recreational areas (Parcels A–1, P1, P2, P3, P4, P5, P6 and P7). As a result, Second National continued to retain a security interest in those lots, yet they were omitted from the 1992 foreclosure action. The omission of these parcels from

the 1992 foreclosure was described as an "error" in a letter dated June 20, 1994, from the Bank to an assignee.

In early December 1992, the Office of Thrift Suspension ("OTS") declared Second National to be a failed institution. The Resolution Trust Corporation ("RTC") was appointed as its conservator and receiver. Shortly thereafter, on December 18, 1992, the foreclosure took place, and the advertised property was sold to RTC "as Conservator for Second National Federal Savings Association, purchaser ... for $1,024,000.00."

As noted, lots 29 and 30, along with lot 68 and the recreational areas, were not included in the first foreclosure sale. Appellants were not given actual notice of the foreclosure proceedings, were not parties to it, and were not afforded an opportunity to participate. The sale, which was ratified on June 7, 1993, resulted in a deficiency of about $2.25 million. That deficiency eventually led to the underlying foreclosure action.

Thereafter, Wyemoor filed a Chapter 7 bankruptcy proceeding. In addition, on December 16, 1994, LTR was placed in receivership, pursuant to an order of the Circuit Court for Baltimore City.

RTC subsequently sold Second National's interest in the Wyemoor loan, together with other assets, to Reliant. From the time of the Wyemoor/HPLP settlement on November 12, 1991, until the acquisition of the Wyemoor loan by Reliant and the commencement of this action, neither Second National nor any other entity ever notified Wyemoor, LTR, or the appellants that Second National did not receive the proceeds from settlement on November 12, 1991, for lots 29 and 30, and never released the lots.

By letter dated November 21, 1997, appellees notified appellants that Reliant acquired an interest in their land. The letter stated, in pertinent part:

Our office has been examining title to land in the Harbor Pointe PRD for the purpose of filing a foreclosure action on behalf of the holder of the original deeds of trust from [Wyemoor], the developer of Harbor Pointe, to [Second

National].... According to our examination of the land records, the property referenced above has never been released from and is therefore still subject to the lien of the aforementioned deeds of trust. Consequently, your property may be sold to satisfy the debt owing to our client unless we have made a mistake or you or your attorney are in possession of an unrecorded release of liens.

On February 24, 1997, appellees filed a second foreclosure action against Wyemoor to recover $2,340,709.60, plus per diem interest of $462.54. For purposes of completing the Statement Of Deed Of Trust Debt, Reliant and its agent, Stephen Beene, utilized the balance due stated in the Assignment And Bill Of Sale furnished to Reliant by RTC, rather than the deficiency amount calculated in the first foreclosure proceeding. Reliant had no personal knowledge as to how RTC had calculated that sum.

In the meantime, LTR's president and controlling stockholder, Joseph E. Goldberg, pled guilty in 1997 to the theft of almost $1,000,000 from LTR's escrow account, and to failure to file a tax return. The embezzled funds were designated to satisfy mortgage liens on properties settled by LTR. According to a newspaper account of the indictment, the theft spanned the period between 1986 and 1994. Goldberg's associate, Patricia Horak, was convicted of conspiracy in the same underlying scheme. Significantly, the Stipulation does not indicate that Goldberg, Horak, or LTR stole the proceeds from the November 1991 settlement of lots 29 and 30.

On March 10, 1998, appellants filed a "Motion To Intervene And To Stay Foreclosure Sale," seeking to avoid the foreclosure of the properties. During the hearing on December 1, 1999, appellants advanced several arguments, including: (1) the evidence and inferences supported their contention that the proceeds of settlement for lots 29 and 30 were remitted to the Bank and the lots were thus released; (2) the Bank's failure to notify appellants of the 1992 foreclosure sale violated their constitutional right to due process; (3) the principles of laches and equitable estoppel bar appellees from pursuing

their claims against appellants; (4) appellees would be unjustly enriched if permitted to foreclose on appellants' improved property, considering that Second National only anticipated a payoff of $27,992.88 for lots 29 and 30, which were then unimproved; (5) some of the records that might have elucidated the issue are not available.

The court ruled that appellants failed to meet their burden of proving that Second National received payment from Wyemoor or executed a partial release of the deeds of trust. Further, the court said:

> I have problems with the case, but from a factual standpoint, it would appear to the Court that the burden of proving that payment was made to Second National would be upon the intervenors, and there is no evidence that— there is evidence that money was withheld at a settlement for payment over to Second National to obtain a partial release of this property from the Deed of Trust that is seeking to be foreclosed in this proceeding. However, there is no evidence that sum of money was ever forwarded by the settlement attorney or the settlement company to Second National.
>
> There is no evidence of a receipt. There is no evidence of any correspondence to Second National. There is evidence of a partial release of Deed of Trust in a file, however, this was never signed by Second National. There is no evidence that that was ever in the possession of Second National.
>
> There is evidence that other payments were made as a result of that settlement. There is evidence of an executed partial Deed of Trust by another party who received payment, and there is evidence of an executed release by a bank who had a judgment, but upon my review of the joint statement of facts, I am not satisfied by a preponderance of the evidence that this money was actually paid to Second National to obtain a release of the two lots in question from the lien of the Deed of Trust.

The court also rejected appellants' arguments as to due process, equitable estoppel, and unjust enrichment, stating:

The intervenor sets forth three arguments to convince the Court that even though payment may not have been received, they are entitled to have their property relieved from the lien of Deed of Trust or at a minimum to be subject only to payment of [$27,922.88,] the sum agreed upon by Second National.

The due process argument, I do not believe is applicable to the facts in this case in any respect. The 1992 foreclosure sale did not purport to foreclose lots 29 and 30. There was no obligation on the Trustees to give notice. The title to the lots was not affected by that proceeding, and there was no violation of due process.

As far as equitable estoppel and unjust enrichment, these two [doctrines] rely to a great extent on actions by Second National, Second National doing something that was relied on by the other party in order to establish equitable estoppel, and Second National didn't do anything.

There might be have been [sic] a settlement attorney that did something. There might have been a bad guy as the phrase has been used in this Court. There are facts out there from which the innocent buyers could have been protected. I call them innocent buyers because the individuals, [appellants], no doubt did not know that their property was subject to this lien. However, in a legal sense, I don't believe they are innocent buyers because the lien of the Deed of Trust was on record. It was a matter of public record. They employed settlement attorneys. They received title insurance to protect them. Somebody should have discovered that there were liens on this property that had not been released.

They are on notice that there was a lien on this property that had not been released, and the lien was a part of the public records of Wicomico County.

So I do not find that the doctrines of equitable estoppel or unjust enrichment apply in this case. I think the equitable solution to the problem would be for the owners of the property to be able to obtain a release for the sum agreed upon by Second National back at the time of the original

settlement in the amount of [$]27,922.88 with interest from that point until today. However, I am not aware and cannot figure out any equitable doctrine that would allow the Court to set that amount as a payoff figure today with all that has transpired between November 12, 1991 and December 1, 1999.

So the Court is going to deny the relief requested by the intervenors.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

The principal issue in controversy, succinctly stated by appellees, is this: "[D]id Land Title Research actually remit the money to Second National?" Appellants contend that "the trial court was clearly erroneous in finding that payment had not been made." At oral argument, appellants maintained that they were "crippled" in their effort to establish payment, because records of the various defunct institutions are now unavailable. Nonetheless, they claim that they unequivocally demonstrated "that Second National acted in a manner consistent" with their belief that Second National had been "paid in full for lots 29 and 30," and the only reasonable inference, based on the Bank's own understanding of the situation, is that the Bank was paid.

Appellees counter that appellants cannot "point to any direct evidence that the release fees for their lots were paid to Second National," and Second National's erroneous assumption that it was paid is "immaterial." Appellees insist that appellants cannot rely on the fact that the Bank "treated the lots as having been paid for and released. . . ." They suggest that the Bank erroneously assumed it had been paid because, once Wyemoor conveyed the lots to HPLP, the lots were no longer held in Wyemoor's name and thus were not taxed to Wyemoor. According to appellees, the "methodology [of the Bank] did not detect any lots that had been conveyed by

Wyemoor but not released from its deed of trust to Second National." Instead, "[b]ecause of this methodology," the Bank "erroneously" concluded "that it did not have a lien interest in lots 29 and 30 and did not include them in its foreclosure sale." In a phrase, appellees assert that the Bank's belief as to release of the lots "does not make it so."

In effect, appellees rely on the absence of direct evidence that the Bank was paid. For example, they observe that neither Second National's or LTR's files, nor the Bank's ledger cards, show that the Bank received the money or released the liens on lots 29 and 30. Thus, appellees assert that "the weight of the evidence supports but one reasonable inference, viz., that [LTR] retained from the settlement proceeds it collected the funds it should have sent to Second National to release Appellants' lots from the Wyemoor deed of trust."

Rule 8–131(c) establishes our standard of review:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

*See In re Joshua David C.,* 116 Md.App. 580, 592, 698 A.2d 1155 (1997) ("Indeed, we accept the facts as found by the hearing judge, unless clearly erroneous."); *State v. Johnson,* 108 Md.App. 54, 71, 670 A.2d 1012 (1996). "If the trial court's findings are supported by substantial evidence, the findings are not clearly erroneous." *Nicholson Air Servs., Inc. v. Board of County Com'rs of Allegany County,* 120 Md.App. 47, 66, 706 A.2d 124 (1998); *see Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834 (1975); *Sea Watch Stores L.L.C. v. Council of Unit Owners,* 115 Md.App. 5, 31, 691 A.2d 750, *cert. dismissed,* 347 Md. 622, 702 A.2d 260 (1997). Put another way, " 'if "competent material evidence" supports the trial court's findings, we must uphold them and cannot set them aside as "clearly erroneous." ' " *Nicholson,* 120 Md.App. at

66–67, 706 A.2d 124 (quoting *Johnson*, 108 Md.App. at 71, 670 A.2d 1012).

■ The trial court found that appellants had the burden of proof, but failed to meet it because they did not produce any direct evidence that the net proceeds of the settlement were forwarded to Second National, or that Second National executed the partial release of the Deed of Trust. We recognize that "[i]t is not our function to substitute our judgment for that of the fact finder, [merely because] we might have reached a different result." *Nicholson*, 120 Md.App. at 67, 706 A.2d 124. Rather, we must affirm the factual finding of the trial court if there is substantial evidence in the record supporting its findings. *See Murphy v. 24th St. Cadillac Corp.*, 353 Md. 480, 497, 727 A.2d 915 (1999); *Nicholson*, 120 Md.App. at 67, 706 A.2d 124. " 'In making this decision, we must assume the truth of all the evidence, and of all the favorable inferences fairly deducible therefrom, tending to support the factual conclusions of the lower court.' " *Nicholson*, 120 Md.App. at 67, 706 A.2d 124 (quoting *Mercedes–Benz v. Garten*, 94 Md.App. 547, 556, 618 A.2d 233 (1993)).

■ Notwithstanding the deference generally accorded to a trial court's factual findings, we conclude that the court was clearly erroneous in finding that appellants failed to meet their burden of proving that the net proceeds of the settlement in November 1991 were paid to Second National. In reaching our conclusion, we are not disputing any credibility-based determinations of the trial court. Indeed, given the posture of this case, in which the evidence was presented entirely by stipulation and joint exhibits, the court never made any credibility determinations.

The crucial events begin at or about the time of the settlement in November 1991. None of the parties to this case was involved in that settlement, and they have no personal knowledge as to what happened to the proceeds of the settlement. Nor did the parties have any control over the records relating to the settlement, and they have undoubtedly been disadvantaged in their efforts to reconstruct exactly what happened.

Wyemoor, LTR, HPLP, and Second National were clearly interested parties, but three of them are no longer viable.

The evidence must be evaluated in light of the particular circumstances of this case. In our view, the totality of the evidence, and the reasonable inferences drawn from the evidence, clearly supported the conclusion that the Bank was paid the $27,922.88 owed to it as net proceeds from the sale of lots 29 and 30 in November 1991. We explain.

At oral argument, appellees asserted that Goldberg and LTR "embezzled" the proceeds that should have been paid to the Bank in connection with Wyemoor's sale of lots 29 and 30 to HPLP in November 1991. But, as we alluded to earlier, the Stipulation does not indicate that LTR, Goldberg, or Horak embezzled or retained the money from the settlement of lots 29 and 30 on November 12, 1991, which funds should have been paid to the Bank. That omission looms large. The fact that LTR and Goldberg stole large sums of money over a period of years does not establish that they embezzled the net proceeds from the particular settlement at issue here. Indeed, other lienholders in regard to this transaction were paid. Moreover, we have not been provided with any explanation as to why appellees could not or did not establish whether LTR, Goldberg, or Horak retained the monies derived from the sale of lots 29 and 30 to HPLP, which funds were earmarked for payment to the Bank. To paraphrase appellees' comments in another context, mere surmise that these funds were among the monies stolen by Goldberg and LTR does not make it so.[7]

At the time of the settlement in November 1991, Second National's interest in the matter was substantial, because it was to have been paid the net proceeds of the settlement on lots 29 and 30. Second National was also well aware of the

---

7. Even if appellants had the initial burden of production as well as the ultimate burden of persuasion as to whether the Bank's lien was satisfied, the Stipulation clearly met their initial burden of production. Therefore, the burden of production shifted to appellees as to whether the Bank's lien was satisfied. *See Port East Transfer, Inc. v. Liberty Mut. Ins. Co.,* 330 Md. 376, 624 A.2d 520 (1993); *Kassap v. Seitz,* 315 Md. 155, 161–2, 553 A.2d 714 (1989).

settlement, as well as the precise amount that it was to receive. "Sherry," at Second National, had forwarded a pay-off amount to LTR less than a week before the settlement. These facts are all the more significant when we consider that the Bank was carefully monitoring the Wyemoor loan because it was "troubled."

As a regulated financial institution, albeit an unsuccessful one, it is reasonable to infer that the Bank would not have ignored a failure by LTR to remit funds that the Bank anticipated with regard to a troubled loan. Moreover, the settlement statement of LTR shows that the net proceeds were to be paid to the Bank, and there is no correspondence from the Bank to LTR, subsequent to the settlement, inquiring about the proceeds. Because it is hard to conceive of how the Bank could forget to collect some $27,000 in loan proceeds, the plausible inference is that the monies were received.

In this regard, it is noteworthy that the Stipulation does not suggest that agents of the Bank were corrupt. Nor does the Stipulation indicate that internal disorganization plagued the Bank in November 1991, when the proceeds were to be paid by LTR. Further, the Stipulation does not speak to why the Bank, on notice of a troubled loan and an impending settlement that would yield funds payable to the Bank, would have been so derelict as to ignore a failure by LTR to remit the funds, when it had told LTR the precise amount it expected to receive. Several agents of the Bank would have had to commit simultaneous derelictions of duty in order for the Bank to have overlooked recovery of its money at the time of the settlement in November 1991.

Moreover, it is quite salient that, at the time when events were relatively fresh, neither Second National as an institution, nor any officer or employee of Second National, ever believed that Second National had any remaining collateral position in lots 29 and 30. Clearly, the Bank believed it had been paid, and it seems logical that, as compared to appellees, the Bank is the one in a position to have had the more accurate understanding. This point merits amplification.

Woodland, an asset manager for the Bank, performed several tasks in regard to the Wyemoor loan, including an inventory of the assets that were still subject to the Bank's security and an examination of the releases or notes in the file concerning releases. Nothing in his recollection of that examination raised any concerns. Moreover, Woodland testified that the Bank examined the Wyemoor loan on numerous occasions, and on every occasion it determined that it did not have a "collateral position" as to lots 29 and 30.

Second National commissioned the Trice appraisal of March 2, 1992, for the specific purpose of valuing the remaining collateral of the Bank. The Trice appraisal followed the November 1991 settlement by just four months. Woodland believed that whatever collateral the Bank still retained was set forth in the property description attached to the appraisal. Lots 29 and 30 were not included in that property description.

As we observed earlier, Second National's files also contained a tax map that had been color-coded to indicate the lots that the Bank thought were owned by Wyemoor and subject to the security interest of the Bank. Lots 29 and 30 were not colored "yellow" to indicate that the Bank still retained a security interest in the lots. The Bank also utilized a plat of Harbor Pointe on which to illustrate what lots Wyemoor still owned. According to the map, lots 29 and 30 were released, and the status of the lots was never questioned by any officer or employee of Second National.

Furthermore, when Second National determined in the Fall of 1992 that it would foreclose on its loan to Wyemoor, Woodland testified that it was the Bank's intention to foreclose on "all the property that [it] had a security interest in." Woodland contacted the Bank's loan servicing department to identify the Bank's remaining collateral. That interaction included visiting the loan servicing department "to determine what was originally [B]ank security less anything that had been released." Lots 29 and 30 were not included.

Nevertheless, appellees consider "immaterial" the Bank's contemporary assessment that it had no collateral position in

the lots. In essence, appellees trivialize the Bank's own understanding of the status of its own loan, by characterizing the documentary evidence that is consistent with the Bank's view as erroneously founded on false assumptions. It attributes the Bank's mistake to its assumption that the lots must have been released, because they were no longer owned by Wyemoor. According to appellees, this explains why the lots were not identified on the plat, tax map, or in the Trice Appraisal.

Clearly, appellees have no personal knowledge of what occurred, and their theory is little more than rank speculation. We do not believe such surmise defeats the repeated indications of the Bank, as creditor, that it had no rights as to lots 29 and 30.

To be sure, the financial records of the Bank and LTR do not show payment to the Bank for lots 29 and 30. But, Second National's records were kept both on handwritten ledger cards and by computer, and the computerized records, which were described as more reliable, are unavailable. In any event, the Stipulation shows that at least some of the ledger cards were inaccurate. For example, LTR remitted $5,237.50 to the Bank on July 2, 1992, for the pay-off of the second trust granted to Wyemoor, but that payment was not recorded on the ledger card. Similarly, as to lot 23, the ledger does not show a payoff, but a check was later found, showing that payment had been made. Therefore, the absence of any notation on the ledger is not definitive as to the issue of payment.

We conclude that the trial court was clearly erroneous in finding that the Bank was not paid with respect to lots 29 and 30. The Bank had a significant interest in collecting its money, and it consistently and contemporaneously believed that it had no collateral position in lots 29 and 30. It could not reach that view unless it determined that the lien had been satisfied. The ultimate manifestation of the Bank's belief that the debt was paid was reflected in the Bank's omission of lots 29 and 30 from the first foreclosure proceeding in 1992.

When the Bank foreclosed on Wyemoor's defaulted loan in 1992, it was obviously in the Bank's interest to include every possible lot in which it had an interest, in order to maximize its recovery. To that end, the Bank made every effort to verify the lots in which it had an interest, and never found any basis to include lots 29 and 30. Clearly, the Bank would not have omitted lots 29 and 30 from the foreclosure if the loan had not been satisfied, or if the Bank had any legitimate basis to include the lots.

In effect, the Bank provided a contemporary assessment regarding its understanding of the status of the loan and the lots subject to the lien. Appellees' post-mortem analysis, almost a decade later, is not nearly as persuasive.

## II.

Alternatively, appellants contend that this case presents an issue of first impression in Maryland as to "whether due process requires notification to all mortgagors when two properties or more are encumbered by one trust and [only] one property is being foreclosed upon. . . ." In essence, appellants claim that the first and second foreclosure actions are inextricably intertwined.

Appellants assert that lots 29 and 30 were "judicially determined to be encumbered by the lien arising out of the agreement between Wyemoor and Second National . . .," and that agreement is the same one that led to the first foreclosure action in 1992. As a result of the first foreclosure and the deficiency that it generated, appellants maintain that "their properties are liable to be sold to satisfy Wyemoor's deficiency. . . ." Thus, they argue that when multiple properties are subject to a single lien instrument, and the lender forecloses on less than all of the properties, due process requires actual notice to the owners of the remaining properties, whose property could be adversely affected by the initial foreclosure proceeding. Because appellants had no actual notice or opportunity to participate in the 1992 foreclosure action, they

claim that they were deprived of a legally protected property interest, without due process.

The trial court concluded that appellants did not have a legally cognizable property interest, because their property was not foreclosed in 1992, they had no lien on the property that was foreclosed, nor did they make any use of that property. Appellants dispute that ruling, asserting that "the courts of this State have embraced an expansive view of the definition of a legally protected property right which is not specifically conditioned on deprivation of title."

In their brief, appellees maintain that appellants "have not demonstrated that they have any traditional, recognized, common law property interest in the property sold in the 1992 foreclosure," which would warrant due process protection, because appellants did not own the property that was sold at foreclosure in 1992, they had no lien on the land or any future interest in it, and they were not debtors, guarantors, or obligors with respect to the underlying mortgage debt. According to appellees, "someone who has never had a recognized interest in mortgaged property owned by another and who has no obligation on the mortgage debt does not magically gain a 'protected property interest' upon the creditor's filing of a foreclosure proceeding merely because the mortgage foreclosed on also encumbers his property."

It appears that, by means of the second foreclosure proceeding, appellees sought to impose liability on lots 29, 30, 68, and the recreational lots, for the entire deficiency of $2,256,009.71 million stemming from the first foreclosure. At oral argument, appellants alleged that, to satisfy the deficiency from the first foreclosure, they could lose their homes, and be liable up to the value of the equity in them. In a footnote in their brief, appellees summarily state that the assertion that they can "'enforce[] the entire mortgage debt of $2,340,709.60 against Appellants' . . . is both exaggerated and incorrect." They do not explain, however, why the assertion is either exaggerated or incorrect.

 The due process clauses in the Fourteenth Amendment and in Article 24 of the Maryland Declaration of Rights protect an individual's interests in substantive and procedural due process. *See Office of People's Counsel v. Maryland Pub. Serv. Comm'n,* 355 Md. 1, 25–27, 733 A.2d 996 (1999) (discussing substantive due process); *Roberts v. Total Health Care, Inc.,* 349 Md. 499, 508–09, 709 A.2d 142 (1998) (discussing procedural due process); *see also Pitsenberger v. Pitsenberger,* 287 Md. 20, 27, 410 A.2d 1052 (1980); *City of Annapolis v. Rowe,* 123 Md.App. 267, 275–77, 717 A.2d 976 (1998). In general, there are four "categories" of due process actions: "(1) a procedural due process claim premised on the deprivation of a property interest; (2) a procedural due process claim premised on the deprivation of a liberty interest; (3) a substantive due process claim premised on the deprivation of a property interest; and (4) a substantive due process claim premised on the deprivation of a liberty interest." *Samuels v. Tschechtelin,* 135 Md.App. 483, 523, 763 A.2d 209 (2000). In this case, we are concerned only with the first category.

 "Procedural due process imposes constraints on governmental decisions [that] deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause...." *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). One of the objectives of due process is "to ensure that individuals who have property rights are not subject to arbitrary governmental deprivation of those rights." K.C. Davis & R.J. Pierce, Jr., *Administrative Law Treatise* § 9.4 at 35 (3rd ed.1994). A fundamental component "of the procedural due process right is the guarantee of an opportunity to be heard and its instrumental corollary, a promise of prior notice." Lawrence Tribe, *American Constitutional Law* § 10–15, at 732 (2nd ed.1988).

 The Supreme Court has emphasized that "state action affecting property must generally be accompanied by notification of that action...." *Tulsa Prof'l Collection Servs. v. Pope,* 485 U.S. 478, 484, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988). As the Court of Appeals echoed in *Roberts,* 349 Md. at 509, 709

A.2d 142: "At '[t]he core of due process is the right to notice and a meaningful opportunity to be heard.'" *Id.* (quoting *LaChance v. Erickson,* 522 U.S. 262, 266, 118 S.Ct. 753, 139 L.Ed.2d 695 (1998)); *see Attorney Grievance Comm'n v. Fezell,* 361 Md. 234, 246, 760 A.2d 1108 (2000); *Owens v. State,* 352 Md. 663, 697, 724 A.2d 43, *cert. denied,* 527 U.S. 1012, 119 S.Ct. 2354, 144 L.Ed.2d 250 (1999); *Blue Cross of Md., Inc. v. Franklin Square Hosp.,* 277 Md. 93, 101, 352 A.2d 798 (1976); *Maryland Racing Comm'n v. Belotti,* 130 Md.App. 23, 55, 744 A.2d 558 (1999).

Procedural due process is a flexible concept that "calls for such procedural protection as a particular situation may demand." *Wagner v. Wagner,* 109 Md.App. 1, 24, 674 A.2d 1, *cert. denied,* 343 Md. 334, 681 A.2d 69 (1996); *see In re Adoption/Guardianship No. 6Z970003,* 127 Md.App. 33, 54, 731 A.2d 467 (1999), *overruled in part on other grounds, In re Adoption/Guardianship No. T97036005,* 358 Md. 1, 16, 746 A.2d 379 (2000). Put another way, "the concept of due process is not static—the process that is due may change according to the circumstances." *Miserandino v. Resort Prop., Inc.,* 345 Md. 43, 65, 691 A.2d 208, *cert. denied,* 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 292, and *cert. denied sub nom., Commonwealth of Va. ex rel. Sec'y v. Miserandino,* 522 U.S. 963, 118 S.Ct. 397, 139 L.Ed.2d 310 (1997); *see Sullivan v. Insurance Comm'r,* 291 Md. 277, 284, 434 A.2d 1024 (1981); *Drolsum v. Horne,* 114 Md.App. 704, 713, 691 A.2d 742, *cert. denied,* 346 Md. 239, 695 A.2d 1227 (1997)(stating that due process is met when "there is at some stage an opportunity to be heard suitable to the occasion") (emphasis omitted).

To succeed in an action alleging a denial of procedural due process, in violation of a property interest, "a plaintiff must demonstrate that he had a protected property interest, that he was deprived of that interest [by the State], and that he was afforded less procedure than was due." *Samuels,* 135 Md.App. at 523, 763 A.2d 209; *see Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538–41, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Roberts,* 349 Md. at 510, 709 A.2d 142;

*Golden Sands Club Condo v. Waller,* 313 Md. 484, 488 n. 4, 545 A.2d 1332 (1988); *Rowe,* 123 Md.App. at 275–76, 717 A.2d 976; *Regan v. Board of Chiropractic Examiners,* 120 Md.App. 494, 510, 707 A.2d 891 (1998), *aff'd,* 355 Md. 397, 735 A.2d 991 (1999). Significantly, "there is no requirement that actual prejudice be shown before denial of due process can be established." *Wagner,* 109 Md.App. at 24, 674 A.2d 1; *see Town of Somerset v. Montgomery County Bd. of Appeals,* 245 Md. 52, 66, 225 A.2d 294 (1966).

 Property is an " 'interest or estate which the law regards of sufficient value for judicial recognition.' " *Dodds v. Shamer,* 339 Md. 540, 548, 663 A.2d 1318 (1995) (citation omitted). Generally, the common law concept of property refers to the right and interest a person has in an object, which extends beyond ownership and possession to include the lawful, unrestricted right of use, enjoyment, and disposal of the object. 63 Am.Jur.2d *Property* § 1, at 66 (1997). It includes tangible as well as intangible property. *See, e.g., Dodds,* 339 Md. at 549–52, 663 A.2d 1318 (liquor license); *St. George Antiochian Orthodox Christian Church v. Aggarwal,* 326 Md. 90, 603 A.2d 484 (1992) (foreclosure of right of redemption of real property).

 A protected property interest can take a number of forms and is not "uniform." *Dodds,* 339 Md. at 549, 663 A.2d 1318. For example, an employee ordinarily has a protected property interest in the economic benefits of his employment. *Rowe,* 123 Md.App. at 292, 717 A.2d 976. *See also Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1974) (students suspended for 10 days without a hearing); *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (prisoners' loss of good time credit); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (revocation of parole). Moreover, due process rights "do not hinge on receipt of monetary benefits." *Rowe,* 123 Md.App. at 287, 717 A.2d 976.

In *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court discussed the

concept of a protected property interest with regard to a "benefit," stating:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Appellees concede that a "mortgage foreclosure conducted pursuant to a legislatively enacted statute and rules promulgated by the Court of Appeals constitutes state action." *See McCann v. McGinnis*, 257 Md. 499, 505, 263 A.2d 536 (1970) (stating that "[t]he court is the vendor in the case of a sale under the power contained in a mortgage, just as it is a vendor in any other chancery sale."); *Warfield v. Dorsey*, 39 Md. 299, 307 (1874). But, relying on *Ayres v. Townsend*, 324 Md. 666, 673–76, 598 A.2d 470 (1991), they observe that no case goes so far as to hold that a guarantor or surety of a mortgage debt, or one with a recorded right of first refusal, is entitled to due process protection of actual notice, and appellants' interest "is even more attenuated," given that "they had no obligation whatsoever with respect to the mortgage debt." Moreover, because appellants were not record owners of the property that was foreclosed in 1992, and they did not hold a subordinate interest in the property, appellees insist that "there is no statutory or other foundation upon which to premise a 'protected property interest' entitling Appellants to receive actual notice of the [first] foreclosure sale."

The provisions governing mortgage foreclosures, including the requisite notice to debtors and record owners of the property, are set forth in the Real Property Article of the Maryland Code and implemented by the Maryland Rules. *See* Md.Code (1974, 1996 Repl.Vol., 1999 Supp.), § 7–105 of the Real Property Article ("R.P."); Maryland Rule 14–201 *et seq.* R.P. § 7–105 is titled "Sales." R.P. § 7–105(b) provides, in part:

(b) *Notice to record owner of property; limitations of actions.*—(1)(i) in this subsection, "record owner" means the person holding record title to property as of the later of:

1. 30 days before the day on which a foreclosure sale of the property is actually held; and

2. The date on which an action to foreclose the mortgage or deed of trust is filed.

(ii) In addition to any notice required to be given by provisions of the Annotated Code of Maryland or the Maryland Rules, the person authorized to make a sale in an action to foreclose a mortgage or deed of trust shall give written notice of the proposed sale to the record owner of the property to be sold.

(2) (i) The written notice shall be sent:

1. By certified mail, postage prepaid, return receipt requested, bearing a postmark from the United States Postal Service, to the record owner; and

2. By first class mail.

\* \* \*

(iii) The person giving the notice shall file in the proceedings:

1. A return receipt; or

2. An affidavit that:

A. The provisions of this paragraph have been complied with; or

B. The address of the record owner is not reasonably ascertainable.

(iv) The person authorized to make a sale in an action to foreclose a mortgage or deed of trust is not required to give notice to a record owner whose address is not reasonably ascertainable.

\* \* \*

In addition, Maryland Rule 14–206 provides, in pertinent part:

**Rule 14–206. Procedure prior to sale.**

\* \* \*

(b) **Notice.**

\* \* \*

(1) By Publication.

(2) By Certified and First Class Mail. (A) Before making a sale of the property, the person authorized to make the sale shall send notice of the time, place, and terms of sale by certified mail and by first class mail to the last known address of (i) the debtor, (ii) the record owner of the property, and (iii) the holder of any subordinate interest in the property subject to the lien.

(B) The notice of the sale shall be sent not more than 30 days and not less than ten days before the date of the sale to all such persons whose identity and address are actually known to the person authorized to make the sale or are reasonably ascertainable from a document recorded, indexed, and available for public inspection 30 days before the date of the sale.

 Here, neither the statute nor the rules obligated the Bank to give notice to appellants in 1992 as to that foreclosure action. Even if a party has complied with the applicable rules or statutes, however, this does not necessarily satisfy the requirements of due process. *See Island Fin., Inc. v. Ballman,* 92 Md.App. 125, 136, 607 A.2d 76 (1992).

The due process requirements of notice and an opportunity to be heard have long been held to apply to tax sales and to foreclosure proceedings. *See, e.g., Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983);

*Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Island Financial,* 92 Md.App. 125, 607 A.2d 76. The critical question here is whether appellants had an interest that amounted to a legally protected property interest with regard to the 1992 foreclosure action. We turn to consider that thorny issue.

In the seminal cases of *Mullane,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865, and *Mennonite,* 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180, the Supreme Court considered the requirements of procedural due process in the context of protected property interests. A discussion of those cases provides guidance here.

In *Mullane,* the Supreme Court recognized that, prior to an action which will affect an interest in life, liberty, or property protected by the Due Process Clause, a state must provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane,* 339 U.S. at 314, 70 S.Ct. 652. The Court found unconstitutional a New York statute that allowed trust companies to provide notice by publication in actions to settle the accounts of trust funds, because it was insufficient to inform the beneficiaries whose names and addresses were known. *Id.* at 320, 70 S.Ct. 652. Rather, personal service or a mailed notice was required. *Id.* at 318, 70 S.Ct. 652. Nor is a token effort acceptable; "a mere gesture" with regard to notice "is not due process." *Id.* at 315, 70 S.Ct. 652.

The Supreme Court applied *Mullane* in *Mennonite,* 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180, when it considered whether an Indiana statute violated the Due Process Clause of the Fourteenth Amendment, because it only required notice by publication to a mortgagee with respect to a tax sale initiated when the mortgagor failed to pay the required property taxes. It found that the Indiana statute violated due process. *Id.* at 795–800, 103 S.Ct. 2706.

The Court in *Mennonite* recognized that "a mortgagee possesses a substantial property interest that is significantly affected by a tax sale." *Id.* at 798, 103 S.Ct. 2706. It

explained that "[t]he tax sale immediately and drastically diminishes the value of this security interest by granting the tax-sale purchaser a lien with priority over that of all other creditors. Ultimately, the tax sale may result in the complete nullification of the mortgagee's interest, since the purchaser acquires title free of all liens and other encumbrances at the conclusion of the redemption period." *Id.* Because a mortgagee has a legally protected property interest, the Court concluded that "he is entitled to notice reasonably calculated to apprise him of a pending tax sale." *Id.* The Court also said: "[A] party's ability to take steps to safeguard its interests does not relieve the State of its constitutional obligation." *Id.* at 799, 103 S.Ct. 2706. Consequently, it determined that the State may not "forego even the relatively modest administrative burden of providing notice by mail to parties who are particularly resourceful." *Id.* at 799–800, 103 S.Ct. 2706. This is because "[n]otice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* party ... if its name and address are reasonably ascertainable." *Id.* at 800, 103 S.Ct. 2706.

In addition to *Mullane* and *Mennonite*, *Island Financial*, 92 Md.App. 125, 607 A.2d 76, is instructive with regard to the issue of whether appellants had a legally protected property interest for which they were entitled to actual notice with regard to the 1992 foreclosure action. In *Island Financial*, a junior mortgagee did not receive notice of the senior mortgagee's foreclosure proceeding until after the sale, and was therefore unable to attend the sale to protect its interest in the property. When the trial court refused to vacate the ratification of the foreclosure sale, Island Financial appealed, claiming it was deprived of property without due process. The appellees argued that they followed the procedures under the rules regulating foreclosure sales and that Island Financial failed to exercise due diligence because it did not record a request for notice of foreclosure, as provided by R.P. § 7–105(c). As appellees did not dispute that State action was involved, *id.* at 129, 607 A.2d 76, the Court focused on whether

Island Financial had a legally protected property interest and on the notice requirement.

The Court recognized that second mortgagees "have a significant, constitutionally protected property interest." *Id.* at 131, 607 A.2d 76. Relying on the rationale of *Mennonite and Mullane,* the Court reversed, stating: "It is clear that Island's interest is protected, because the ratification of the foreclosure sale has the ultimate effect of nullifying Island's interest in the property ... the same effect that the tax sale in *Mennonite* had upon the mortgagee's interest." *Id.* at 131, 607 A.2d 76.

Although appellees complied with the statutory requirements as to notice, and Island Financial failed to submit a request for notice of sale as required by R.P. § 7–105(c), the Court said: "Constitutional due process protection does not exist only for those who follow the notice statute but encompasses all interests that may be affected by state action." *Id.* at 136, 607 A.2d 76. Rather, the Court recognized that "procedural due process protection requires a State to provide 'notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Id.* at 130, 607 A.2d 76 (quoting *Mullane,* 339 U.S. at 318, 70 S.Ct. 652). It reasoned that "[t]he statute is designed to go hand in hand with constitutional protection so that no property interest will be unfairly extinguished." *Id.* at 136, 607 A.2d 76.

The Court added that actual or mailed notice is required, rather than publication, if the person's name and address are "'reasonably ascertainable.'" *Id.* at 131–32, 607 A.2d 76 (quoting *Mennonite,* 462 U.S. at 800, 103 S.Ct. 2706). In considering whether the foreclosing party would be unfairly burdened by providing actual notice to holders of subordinate property interests, the Court concluded that it required little effort to locate Island, either through the corporate division of the Maryland Department of Assessments and Taxation, or from its deed of trust, which was properly recorded. Thus, the Court ordered a resale. *Id.* at 136, 607 A.2d 76.

By analogy, appellants rely, *inter alia,* on cases arising from an earlier version of the Veterans Administration ("VA") home loan guaranty program to support their due process claim. *See* 38 U.S.C. §§ 3701–3751 (1994). *United States v. Whitney,* 602 F.Supp. 722 (W.D.N.Y.1985), is illustrative.

In *Whitney,* the United States sought to collect from a veteran a deficiency that arose from a mortgage foreclosure on property originally purchased by the veteran, but no longer owned by the veteran at the time of the lender's foreclosure. The VA guaranteed the mortgage but, by agreement with the VA, the veteran remained personally liable on the mortgage debt, despite a subsequent transfer of the property and the assumption of the mortgage by others. Years after the veteran sold the property, the lender foreclosed, without notice to Whitney, and the sale was insufficient to satisfy the debt due under the mortgage. As a result, the VA reimbursed the lender for the deficiency and then sought to collect from Whitney. He claimed that "since he was never made a party to the original foreclosure proceeding ... [he was] denied due process of law." *Whitney,* 602 F.Supp. at 725. The federal court agreed. *Id.* at 733.

With regard to the due process issue, the court recognized that "the failure to place Whitney on notice of the mortgage foreclosure raises concerns of constitutional magnitude." *Id.* at 731. The court stated that: "it is clear that a mortgagor 'possesses a substantial property interest that is significantly affected by a [foreclosure] sale.'" *Id.* at 732 (alteration in original) (citation omitted). Because a mortgagor has a legally protected property interest, he is "constitutionally entitled to notice reasonably calculated to apprise him" of the pending foreclosure. *Id.* The court reasoned that, "[i]n the absence of meaningful notice, [the veteran] is denied the opportunity to exercise his equity of redemption or to bid in on the proceeding disposing of the property." *Id.* Moreover, the court was of the view that the name and address of the veteran "could have been easily ascertained prior to the foreclosure sale." *Id.See also Boley v. Brown,* 10 F.3d 218, 222 (4th Cir.1993)(stating that a mortgagor "had an interest in trying to avoid a determi-

nation that foreclosure was necessary at the foreclosure hearing and in assuring that fair value was received for the property at the foreclosure sale.").

Citing *Barry Properties, Inc. v. Fick Bros. Roofing Co.*, 277 Md. 15, 353 A.2d 222 (1976), appellants also argue in their reply brief that "[a]n analogy can be made between the present case and mechanic's lien cases." Fick, a subcontractor, was not paid by the general contractor for work performed on Barry's property, and brought a mechanic's lien action against Barry's property. Under the then existing Maryland statute, the lien attached to Barry's property as soon as the work was performed. Barry argued that Maryland's mechanics' lien law deprived him of his property, without notice or an opportunity to be heard. Recognizing that the mechanics' lien deprived an owner of a "significant property interest" the Court concluded that "the limitations of due process are applicable." *Id.* at 24, 353 A.2d 222 (footnote omitted). The Court reasoned, 277 Md. at 23–24, 353 A.2d 222:

Although possession will not be wrested from the owner until a purchaser acquires title through a foreclosure sale and the owner can still legally alienate or further encumber the property until that time, in reality, since he no longer has unfettered title, not only will it be extremely difficult for him to do so but additionally his equity will be diminished to the extent of the lien. This is graphically demonstrated in the present case since, due to the appellee's lien, the appellant was deprived of the balance of its construction mortgage and was unable to close a permanent mortgage or to obtain a second mortgage on the property's equity.

In the unusual context of this case, we conclude that appellants had a legally protected property interest in the 1992 foreclosure proceedings, even though their particular lots were omitted from that foreclosure action, and they had no ownership interest in the property that was actually foreclosed. To begin with, the contentions that the Bank was never paid, it never released its liens, and it inadvertently omitted

lots 29 and 30 from the first foreclosure undergird appellees' claims in the second foreclosure action. Had lots 29 and 30 been included in the first foreclosure, however, it seems rather clear that appellants would have been entitled to notice and due process, because they had already settled on the purchase of their homes a few months earlier. To be sure, it would have been far easier in 1992 for appellants to ascertain whether their lots were released as a result of the settlement in November 1991. Nor is this a case of constructive knowledge or lack of diligence on the part of appellants, considering that, under appellees' version of events, even Second National did not know in 1992 that appellants' lots were still encumbered.

Clearly, appellants had more than a theoretical interest in the first foreclosure. Wyemoor was obligated to Second National with respect to a multi-million dollar debt, which was secured by numerous lots or parcels, including lots 29 and 30; a single lien instrument collateralized the properties that were the subject of both foreclosure actions. By happenstance, the Bank did not foreclose in the first proceeding on all the lots in which it allegedly had an interest. Although lots 29 and 30 were omitted from the first foreclosure action, they were inextricably tied to the lots that were subject to that foreclosure action; because lots 29 and 30 served as collateral for the same loan, under the same lien instrument, they were at risk to satisfy any deficiency from the first proceeding. Thus, even if appellants' lots were not released in 1991, appellants certainly had an interest in the first foreclosure, to assure that the property that was foreclosed sold for the highest possible price.

To suggest that the fate of appellants' properties was not directly connected to the 1992 foreclosure is to ignore the reality that appellants' property rights could be nullified, just as in *Mennonite* and *Island Financial.* The piecemeal approach of the Bank, or its successor, to recover the debt owed to the Bank cannot be used to make an end run around the due process protections ordinarily afforded to those persons whose rights are fundamentally affected by the outcome of a foreclosure proceeding. We are hard pressed to understand

why the Bank's failure to proceed against lots 29 and 30 in the first place, whether inadvertently or intentionally, alters appellants' due process rights at this juncture.

As in *Island Financial,* 92 Md.App. 125, 607 A.2d 76, we are unaware of any statutory provision or rule that required the Bank to notify appellants of the first foreclosure. Nevertheless, even though the junior mortgagee in that case failed to comply with its statutory obligation to file "a formal request for notice ...," the Court concluded that, "[i]f an interest of a party is reasonably ascertainable ... the minimum requirements of due process dictate that actual notice be given." *Id.* at 136, 607 A.2d 76. Here, appellants' interests were not just reasonably ascertainable in 1992. Rather, they were readily ascertainable, because the deeds of conveyance were recorded in the land records. Therefore, the Bank, as the foreclosing party in 1992, would not have been unfairly burdened by providing actual notice to appellants.

In sum, although appellants did not own the lots that were sold in 1992, ownership is not a litmus test. It is evident that the fate of appellants' property hinged on the very proceedings about which they were never notified. Given that the outcome of the 1992 proceeding might well have a profound effect on appellants' property interests, they were entitled to basic due process protections.

Appellants contend that the "normal remedy" for the due process violation would require the sale to be "re-conducted with proper notice...." But, they assert that no such option is realistic here, because it is "impossible to reconstruct the 1992 foreclosure sale." In their view, "the most obvious remedy" is to bar collection of the alleged debt. Alternatively, if the obligation is found to exist, they assert that it would be appropriate "to set the debt at the original release amount, plus interest ...," which would "restore the parties to the status quo as it existed in 1992...." Because the court below found no due process violation, it never considered the issue of the appropriate remedy. Ordinarily, we would remand to the trial court for consideration of that question, in the first

instance. But, in light of our resolution of the first issue, a remand is not appropriate.

**JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEES.**